

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00184-CV

AIMEE DELYN HALLEMAN                                        APPELLANT

V.

EDWARD CHARLES HALLEMAN                                     APPELLEE

----------

### FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

----------

## OPINION

----------

## I. INTRODUCTION

In five issues, Appellant Aimee Delyn Halleman appeals from the divorce decree dissolving her marriage to Appellee Edward Charles Halleman and from an order awarding Edward attorney's fees pending appeal. We will affirm.

## II. BACKGROUND

Aimee and Edward married in October 2000. They lived in Flower Mound; had one child together, L.L.H., born in June 2005; and both worked for the same

employer before and during much of the marriage. Aside from these and a few other undisputed facts, Aimee's and Edward's versions of many of the events that occurred during their marriage differed markedly.

According to Aimee, she first noticed that her marriage with Edward was "on the rocks" shortly after L.L.H. was born. Their relationship had become "volatile," Edward was spending a considerable amount of time away from home with his friend Gary, they had sex only a few times between L.L.H.'s birth and when Aimee filed for divorce, and they did not share a ride to work as often as they used to. Aimee considered filing for divorce in the summer of 2007 but instead saw a marriage counselor in October 2007 in hopes of improving the marriage. Things, however, just "got worse," even after Gary had moved away.

According to Edward, after L.L.H.'s birth, Edward and Aimee did not grow apart; they continued to have a regular sexual relationship; they continued to carpool to work until January 2008; Edward did not spend nearly as much time with Gary as Aimee contended; and before March 2008, Aimee never recommended that they attend counseling nor did she tell Edward that she had visited a counselor. But beginning in November or December 2007, Edward noticed that Aimee was spending more time traveling with her boss, Mark, and returning home later at night after entertaining clients with him. Edward was also surprised that unlike in 2005 and 2006, when he and Aimee both used vacation time during the last two weeks of the year to shop for Christmas, Aimee did not use any vacation time at the end of the year but instead worked, sometimes at

nights with Mark. Edward developed a concern that "something was going on" in their marriage. In March 2008, Edward used Aimee's work laptop at home to finish a presentation and discovered a series of emails between Aimee and Mark that led Edward to believe that Aimee was having an affair with Mark. Heartbroken, Edward confronted Aimee with the emails, but she denied having an affair. Edward asked Aimee to stop traveling with Mark for work, but she declined the request. Thereafter, Aimee's communication with Edward slowed, and she tried to "isolate" him from L.L.H. "every opportunity she had."

Aimee filed for divorce in May 2008 and requested the exclusive right to designate L.L.H.'s primary residence. Edward filed a counterpetition for divorce also requesting that he be awarded the exclusive right to designate the primary residence of L.L.H. The trial court issued temporary orders naming Edward primary conservator and gave Aimee a standard possession order.

A final jury trial commenced in October 2010 to determine who had the right to designate L.L.H.'s primary residence.[1] After considering the testimony of Aimee, Edward, and numerous other witnesses, the jury chose Edward. The remaining issues—dissolution, property division, visitation, and support—were heard and determined by the trial court. In addition to granting the divorce, dividing the community estate, and awarding Edward $50,000 in attorney's fees,

---

[1]The sole jury question submitted asked, "To which parent do you find, from a preponderance of the evidence, it would be in the best interest of the child to grant the exclusive right to set the residence of the child?"

3

the trial court awarded Edward the exclusive right to consent to medical, dental, and surgical treatment of L.L.H. involving invasive procedures; the exclusive right to consent to psychiatric and psychological treatment of L.L.H.; and the exclusive right to make decisions concerning L.L.H.'s education. The trial court later entered findings of fact and conclusions of law and a temporary order pending appeal awarding Edward appellate attorney's fees in the amount of $95,000.

### III. PRIMARY CONSERVATORSHIP AND EXCLUSIVE RIGHTS

In her first issue, Aimee argues that the evidence is factually insufficient to support the jury's verdict awarding Edward the exclusive right to determine L.L.H.'s primary residence. In her second issue, Aimee argues that the trial court abused its discretion by awarding Edward the exclusive right to consent to L.L.H.'s medical and psychological treatment and to make decisions regarding her education. Because the evidence is interrelated, we will conduct a consolidated review.

### A. Standards of Review

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*,

4

395 S.W.2d 821, 823 (Tex. 1965). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). A jury confronted with conflicting evidence may choose to believe one witness and disbelieve others, it may resolve inconsistencies in the testimony of any witness, or it may accept lay testimony over that of experts. *City of Keller v. Wilson*, 168 S.W.3d 802, 819–20 (Tex. 2005).

We review the trial court's decisions on custody, control, possession, and visitation matters for an abuse of discretion. *Newell v. Newell*, 349 S.W.3d 717, 720 (Tex. App.—Fort Worth 2011, no pet.). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). Legal and factual sufficiency are not independent grounds of error in this context, but they are relevant factors in deciding whether the trial court abused its discretion. *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g).

The best interest of the child shall always be the primary consideration in determining the issues of conservatorship and possession of and access to the

child.[2]  Tex. Fam. Code Ann. § 153.002 (West 2008); *see Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing nonexhaustive factors court may use to determine best interest).

## B.  Specific Arguments and Analysis

Aimee argues that in order to reach the conclusion that it did—award Edward primary conservatorship—the jury had to both reject her testimony and "discredit all of the evidence adduced from objective, impartial third parties."  She contends that the jury's "[i]mputing a perception of one party's lack of credibility [presumably Aimee's] on all objective corroborations of that party's position is *not* reasonable"; therefore, the jury's verdict fell outside the zone of reasonable disagreement.  Likewise, in attacking the trial court's decision to award Edward certain exclusive decision-making rights, Aimee argues that "[i]t was not reasonable for the Trial Court to ignore all of the evidence demonstrating that the parties were competent to exercise these rights independently."  She challenges the sufficiency of the evidence to support the trial court's findings of fact 6, 7, 8, and 9, which pertain to the exclusive decision-making rights awarded to Edward.[3]

We have reviewed the record.  In arriving at its determination that it is in L.L.H.'s best interest that Edward be the conservator with the exclusive right to

[2]The jury was so instructed at trial.

[3]Aimee also challenges other findings of fact—7, 12, 13, 14, 15, 16, 17, 19, 20, 21, 24, 25, 26, 27, 29, 30, 32, 33, 34, 35, 36—on the grounds that they either misapply the law, pertain to a non-ultimate issue, or relate to an issue that the jury decided.

designate L.L.H.'s primary residence, the jury reasonably could have (1) determined that Aimee and several of her purportedly impartial, third-party witnesses were less credible than Edward and several of his witnesses; (2) resolved conflicting evidence in favor of Edward; and (3) given less weight to Aimee's and some of her witnesses' testimony than to Edward's and some of his witnesses' testimony. As factfinder, the trial court could have reasoned similarly regarding L.L.H.'s education and her medical and psychological treatment. We set out some, but not all, of the evidence that the factfinders could have considered. *See Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006) ("[N]either the appellate rules nor this Court require detailed recitations of the evidence when a factual sufficiency complaint is overruled.").

### 1. Aimee's Relationship with Mark

Aimee acknowledged that her testimony at the May 2008 temporary orders hearing that her relationship with Mark was "purely professional" was not "the complete truth." She testified that Mark was actually "a very close friend" at the time. Further, although Aimee claimed that she did not begin to have a physical relationship with Mark until July 2008, after the temporary orders hearing, the jury heard Edward's testimony about the concern that he had developed by late 2007 or early 2008 that "something was going on" with his marriage, and it considered emails between Aimee and Mark that had ultimately led Edward to conclude that Aimee was having an affair. Specifically, Aimee stated the following to Mark in several of the emails dated around February 2008: "Lets go make out!"; "You

7

just owe me a nice juicy make out session!  VERY SOON!"; "Could have made it a HOT date night!!"; and "74.00 at the Sheraton or 125.00 at the Ritz?  Will you be all mine???"  In addition to rejecting Aimee's testimony that she did not begin a physical relationship with Mark until after the divorce was filed, the jury could have reasonably concluded that Aimee was less credible after she admitted to not being completely truthful with the trial court.

### 2. Aimee's Allegations of Violence

Aimee testified that when Edward confronted her with the emails in early March 2008, he grabbed her by the wrists, threw her down on the floor, grabbed her again, and said, "I ought to knock your teeth out right now."  Edward disagreed with Aimee's testimony.  He explained that he did not touch Aimee that night and that he had never struck her, pushed her down, held her head on the carpet, or been violent to her in any way.  Aimee agreed that she did not call the police that night, did not file for divorce until two months later, and did not file a motion for a protective order.  The jury could have chosen to reject Aimee's testimony that Edward was physically violent with her and concluded that her testimony negatively impacted her credibility.

### 3. Aimee's Allegations of Drug Use

Aimee accused Edward of smoking marijuana before and after L.L.H. was born and up until the divorce was filed.  Edward acknowledged that he had smoked marijuana but said that he had last done so sometime in 2002 or 2003— several years before L.L.H. was born.  The trial court admitted in evidence

8

several photographs that Aimee had contended showed Edward's marijuana located at the marital residence, but Edward was unable to identify what the photographs actually depicted. Several of the photographs did, however, contain the date "APR 27 2008" printed on them, which was only four days before Aimee filed her original petition for divorce. Edward testified that "[w]ithout question" it was clear to him that from March 2008 forward, Aimee's goal was to "destroy" him in the divorce. Again, the jury could have rejected Aimee's testimony that Edward was a habitual drug user and reasoned that her testimony negatively impacted her credibility.

### 4. Aimee's Testimony About Edward and L.L.H.

Aimee testified that Edward was "indifferent" when he learned that she was pregnant, that he attended only 40% of her weekly doctor's appointments during her high-risk pregnancy, and that she thought he felt inconvenienced during her two-and-a-half-day stay at the hospital after L.L.H.'s birth. Aimee recalled that when L.L.H. was born, Edward left the hospital to let the dogs out and to go to Gary's. Aimee said that Edward spent even more time with Gary after L.L.H. was born (as much as four times a week every week) and that she had asked him every day if he would stay home more often, but Edward responded that he had things to do at Gary's. Aimee also expressed concern about L.L.H.'s hygiene when Edward has possession of L.L.H., explaining that there have been times when her hair was greasy, she did not smell clean, and she was wearing the same clothes that she was wearing when Aimee dropped her off.

9

Contrary to Aimee's testimony, Edward said that he was "elated" when Aimee became pregnant and that he missed only one doctor's visit during her pregnancy, and he described to the jury the events surrounding L.L.H.'s birth in detail. Edward explained that he left the hospital later in the evening after L.L.H.'s birth to go take care of the dogs and (on the advice of their veterinarian) to allow the dogs to sniff the blankets that L.L.H. had been wrapped in but that he "[a]bsolutely [did] not" go to Gary's. Edward disagreed that he spent as much time with Gary after L.L.H.'s birth as Aimee estimated, pointing out that his Sunday routine included taking L.L.H. to the park to feed the ducks and to play. Suzanne Freeney, a neighbor of Aimee's and Edward's since 2005, testified that she thought Edward was more involved with L.L.H. than Aimee was before Aimee moved away. Regarding L.L.H.'s hygiene, Edward testified that he ensures that L.L.H. is always cleaned, and he explained that he does indeed return L.L.H. to Aimee in the same clothes that L.L.H. wears when Aimee returns L.L.H. to him because when he does not, the clothes that he purchases for L.L.H. "don't come back, and specifically the socks I put [L.L.H.] in, [Aimee] cuts them up in front of [L.L.H.]" The jury reasonably could have resolved these conflicts in Aimee's and Edward's testimony in favor of Edward.

### 5. Dr. Michael Flynn

The trial court appointed Dr. Flynn, a psychologist and lawyer, to perform a social study. He interviewed both Aimee and Edward and gathered information from several individuals (or "collateral sources") as part of his evaluation.

10

Dr. Flynn ultimately opined that Aimee is better suited to be L.L.H.'s primary conservator because "her social skills are smoother and more facile" than Edward's, Edward "is a little stiff with people," and L.L.H. will survive with Edward but thrive with Aimee. On cross-examination, however, Dr. Flynn acknowledged that family code section 107.0514 identifies two elements of a social study as including the "interview . . . of each child at issue in the suit who is at least four years of age" and "the obtaining of information from relevant collateral sources." *See* Tex. Fam. Code Ann. § 107.0514(a)(2), (4) (West 2008). Dr. Flynn explained that he neither interviewed L.L.H. nor did he talk to any of the "collateral sources" that Edward had identified for him. Although Dr. Flynn explained his actions by pointing out that he did speak to L.L.H., albeit in the presence of Aimee and Edward, and that when performing a social study he seeks to avoid interviewing sources that may have an "agenda," such as neighbors or relatives, nothing prohibited the jury from altogether rejecting or affording less weight to Dr. Flynn's recommendation that Aimee be appointed primary conservator because the jury could have resolved the best-interest-of-the-child inquiry without the benefit of Dr. Flynn's testimony. *See City of Keller*, 168 S.W.3d at 820 (providing that jurors may disregard even uncontroverted expert testimony unless the subject is one for experts alone); *Garcia v. Garcia*, No. 04-06-00440-CV, 2007 WL 2116399, at *2–4 (Tex. App.—San Antonio July 25, 2007, no pet.) (mem. op.) (holding evidence legally and factually

11

sufficient to support jury's decision to appoint father primary conservator despite different recommendation in social study).

### 6. Michelle Kearby

Kearby testified that Aimee began bringing L.L.H. to counseling in February 2009. Kearby was concerned about several things that L.L.H. had reported about Edward—that she had showered with him and that he had tickled her in her "private parts"—but Kearby said that those things were no longer occurring.[4] Kearby reported to CPS L.L.H.'s "outcry" that Edward had tickled her "private parts," but CPS ruled out the allegation.[5] When pressed to give an opinion about whether it would be in L.L.H.'s best interest for either Aimee or Edward to be primary conservator, Kearby responded that she thought it was in L.L.H.'s best interest "to have equal time with both of her parents." The jury could have reasonably concluded that Kearby's testimony favored neither Aimee nor Edward.

### 7. Shauna Walker and Diana Kravik

Walker and Kravik both taught L.L.H. at the Primrose School of Wellington, where L.L.H. attended daycare and pre-kindergarten, and both testified relatively favorably for Aimee. Walker recalled that L.L.H. was dressed nicer when Aimee

---

[4]Edward explained that he had showered with L.L.H. on one occasion, but it happened after they had been swimming and he wore his bathing suit.

[5]Two additional reports were later made to CPS, but they too were either ruled out or dismissed.

dropped her off, that L.L.H. was often late when Edward dropped her off, that L.L.H. sometimes seemed tired after staying with Edward, and that L.L.H. was Aimee's number one priority. Kravik echoed some of Walker's testimony about L.L.H. and additionally opined that L.L.H. was "in awe" of Aimee.

But Edward testified that after Aimee moved out of the marital residence, she began bringing goody bags to L.L.H. at Primrose, calling L.L.H. there every day, and taking her out for lunch during periods of his possession. For various reasons, Edward asked the Primrose staff to stop permitting Aimee to do those things, but they did not respond to all of his requests, and his relationship with the staff consequently deteriorated as the divorce proceeded. Although he did not go into any specifics, Edward testified that there were occasions when he thought that Walker had lied to him. Edward consequently enrolled L.L.H. in kindergarten at a different school. The jury reasonably could have weighed the evidence about L.L.H. and Primrose either equally between both Aimee and Edward or in favor of Edward.

### 8. Aimee's Involvement at L.L.H.'s Current School

Aimee testified at the bench trial that she is "very active" at L.L.H.'s school. Specifically, she is on the PTA, she volunteers, she coordinates the kindergarten lunch program, she is a "technology mom" and a "Monday mom," she works in the library, and she eats lunch with L.L.H. at school up to three times a week. Edward explained that his level of participation at L.L.H.'s school is not as high as Aimee's because L.L.H. needs to establish her independence and because

13

Aimee's significant involvement is disruptive to L.L.H. Edward cited these concerns as reasons to award him the exclusive right to make decisions regarding L.L.H.'s education.

### 9. Aimee, Edward, and L.L.H.

Aimee is employed and testified that she wants to be the primary conservator of L.L.H. because she wants "to be there to protect her, and to be with her, make sure she's taken care of, she's healthy, she's in good schools, and that she's safe." According to Aimee, the most important thing for L.L.H. is that she is happy.

Edward testified that he lost his job in July 2010 after working for the same employer for twenty years but that he planned to "vigorously" pursue a job after the divorce proceedings concluded. Edward explained the routine that he and L.L.H. have developed, that L.L.H. has many friends in the neighborhood, and that the highest priority in his life is L.L.H.

### 10. Holding

The evidence supporting the jury's verdict awarding Edward the exclusive right to determine L.L.H.'s primary residence is not so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *See Pool*, 715 S.W.2d at 635; *Cain*, 709 S.W.2d at 176. Therefore, the evidence is factually sufficient to support the jury's verdict. Further, the trial court's decision to award Edward the exclusive right to consent to L.L.H.'s medical and psychological treatment and to make decisions regarding

14

her education was neither arbitrary nor unreasonable and, therefore, not an abuse of discretion. *See Low*, 221 S.W.3d at 614. Except for findings 6, 7, 8 and 9, which are subsumed in our holding immediately above, to the extent that any of the other challenged findings are erroneous for one of the reasons identified by Aimee, they are immaterial.[6] *See Cooke Cnty. Tax Appraisal Dist. v. Teel*, 129 S.W.3d 724, 731 (Tex. App.—Fort Worth 2004, no pet.) (reasoning that immaterial finding of fact is harmless and not grounds for reversal). Accordingly, we overrule Aimee's first and second issues.

## IV. PROPERTY DIVISION

In her third issue, Aimee argues that the trial court abused its discretion in its division of the community estate. She points out that the trial court divided the community assets 76% to Edward and 24% to Aimee but that Edward received 99.6% of the community estate when the $50,000 attorney's fee award is accounted for.

A trial judge is charged with dividing the community estate in a "just and right" manner, considering the rights of both parties. Tex. Fam. Code Ann. § 7.001 (West 2006); *Watson v. Watson*, 286 S.W.3d 519, 522 (Tex. App.—Fort Worth 2009, no pet.). The court has broad discretion in making a just and right division, and absent a clear abuse of discretion, we will not disturb that division.

---

[6]Aimee argues that the only way to rationalize the trial court's findings is to conclude that it based its decisions on events that occurred after the temporary orders were entered but before the final trial. There is nothing in the record to support this contention.

*Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985); *Boyd v. Boyd*, 131 S.W.3d 605, 610 (Tex. App.—Fort Worth 2004, no pet.).

Community property does not have to be divided equally, but the division must be equitable. *Kimsey v. Kimsey*, 965 S.W.2d 690, 704 (Tex. App.—El Paso 1998, pet. denied). The trial court may consider the following non-exclusive factors, among others, in determining whether the division of the community estate is equitable: (1) the spouse's capacities and abilities; (2) education; (3) the relative financial conditions and obligations of the parties; (4) size of the separate estates; (5) the nature of the property; (6) disparities in earning capacities and income; (7) fault of the breakup of the marriage; and (8) any wasting of the community assets by one of the spouses. *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981). A disproportionate division must be supported by some reasonable basis. *Smith v. Smith*, 143 S.W.3d 206, 214 (Tex. App.—Waco 2004, no pet.).

According to Aimee's proposed property division, the marital residence had a gross value of approximately $287,000 and community property equity in the amount of approximately $48,000. Aimee proposed that the trial court award Edward all of the community estate in the residence, and it did, in addition to awarding Edward all of the approximately $220,000 in debt remaining on the residence. Edward had a separate property interest in the residence of approximately $26,000.

16

The community portion of Edward's 401(k) consisted of approximately $100,000, and Aimee proposed to divide that amount almost equally between her and Edward, but the trial court awarded Edward all of the community funds in the account. Aimee's 401(k) contained approximately $44,000 of community funds, and the trial court awarded the entire amount to Aimee, as she had requested. Edward's separate property interest in his 401(k) was approximately $34,000, and Aimee's separate property interest in her 401(k) was approximately $8,000.

It thus appears that the primary difference between Aimee's proposed property division and the property division ordered by the trial court is its award to Edward of 100% instead of 50% of the community funds in his 401(k) and $50,000 in attorney's fees. A reasonable basis supports the trial court's disproportionate division of the community estate.

Edward was unemployed at the time of trial, and the trial court awarded all of the remaining debt on the marital residence to him. Conversely, Aimee was employed at the time of trial (working for a business for which her mother is the president), her mother purchased her house for her, and her mother makes the monthly mortgage payments on the house. Although Aimee denied that she had tried to get Edward fired, he testified that Aimee played a "significant role" in his termination from his long-time employer—sometime *after* Aimee filed for divorce, she complained to Edward's employer that he had accessed the emails on her laptop back in March 2008, and Edward was placed on suspension and eventually let go.

17

Also, Edward incurred approximately $195,000 in attorney's fees over the course of the divorce, and although his mother helped him pay the fees, Edward explained that he was obligated to reimburse her. Aimee testified that she had incurred approximately $175,000 in attorney's fees and that her mother had paid the fees, but Aimee did not testify that she was obligated to repay her mother.

To the extent that the trial court concluded that Aimee's relationship with Mark played a role in the breakup of the marriage, it could have considered those facts in making its property division. Accordingly, we hold that the trial court's community property division was equitable and that the trial court therefore did not abuse its discretion by dividing the community estate in favor of Edward. We overrule Aimee's third issue.

## V. PROPERTY DIVISION PUNISHMENT AND FAULT FACTOR

In her fourth issue, Aimee argues that the trial court erred by using the property division as a means to punish her. There is nothing in the record to support this argument. As we concluded above, a reasonable basis supports the trial court's equitable disproportionate property division.

Aimee also argues that there was no evidence that she committed adultery prior to filing for divorce and, therefore, that the trial court abused its discretion by relying on her pre-divorce adultery as a factor in its disproportionate division of the community estate.

Circumstantial evidence may be used to establish any material fact, but it must transcend mere suspicion, and the material fact must be reasonably

18

inferred from the known circumstances. *Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex. 2001). Adultery can be shown by circumstantial evidence. *Newberry v. Newberry*, 351 S.W.3d 552, 556 (Tex. App.—El Paso 2011, no pet.).

The trial court could have reasonably inferred that Aimee committed adultery before filing for divorce based on the following evidence: (1) the content of the emails that Aimee and Mark exchanged, (2) Edward's testimony that he thought "something was going on" with his marriage, (3) Aimee's admission that she had a physical relationship with Mark, and (4) Aimee's acknowledgment that she was not completely truthful with the trial court at the temporary orders hearing about her relationship with Mark. *See id.* (holding evidence legally and factually sufficient to support trial court's finding of adultery as basis for divorce when appellant went into room with his high school sweetheart and stayed there with the doors closed and lights off for more than twenty minutes). Moreover, for the reasons set out already, the trial court's disproportionate property division is equitable even in the absence of any evidence that Aimee committed adultery before filing for divorce. We overrule Aimee's fourth issue.

## VI. APPELLATE ATTORNEY'S FEES

In her fifth issue, Aimee argues that the trial court abused its discretion by awarding Edward appellate attorney's fees pending appeal in the total amount of $95,000.

The family code permits the trial court to render a temporary order necessary for the preservation of the property and for the protection of the parties

during an appeal, including an order for the payment of attorney's fees and expenses. Tex. Fam. Code Ann. § 6.709(a)(2) (West 2006); *see also id.* § 109.001 (West 2008) (permitting order for attorney's fees necessary for the safety and welfare of the child pending appeal). "As long as there is a credible showing of the need for attorney's fees in the amount requested and the ability of the opposing spouse to meet that need, the trial court has authority by temporary orders to require the payment of such fees." *Herschberg v. Herschberg*, 994 S.W.2d 273, 279 (Tex. App.—Corpus Christi 1999, no pet.).

Edward initially argues that Aimee is collaterally estopped from asserting this issue because this court already considered the same issue in an original proceeding filed by Aimee in cause 02-11-00259-CV. *See Halleman v. Halleman*, Nos. 02-11-00238-CV, 02-11-00259-CV, 2011 WL 5247882, at *3–5 (Tex. App.—Fort Worth Nov. 3, 2011, orig. proceeding) (mem. op.). We disagree. The trial court's original order awarding Edward attorney's fees pending appeal did not condition the awards on an unsuccessful appeal by Aimee. Instead, the order required Aimee to prepay $95,000 into the trial court's registry. Aimee therefore (multifariously) argued in her third issue in the original proceeding that the trial court abused its discretion "by ordering her to pay $95,000 in [Edward's] attorney's fees on appeal *and* to prepay that amount into the court's registry." *Id.* at *3 (emphasis added). We concluded that the trial court had abused its discretion by requiring Aimee "to prepay" the $95,000 and that Aimee did not have an adequate remedy by appeal, and we ordered the trial

20

court (a) to vacate the provisions of its order requiring "the *immediate* deposit of $95,000 into the trial court's registry" and (b) to substitute language in the order awarding Edward appellate attorney's fees conditioned upon his success at the intermediate appellate court and at the supreme court. *Id.* at *4–5 (emphasis added). Thus, while we agreed with Aimee that the trial court had abused its discretion by requiring her to deposit $95,000 into the trial court's registry "in order to continue with her appeal," we did not otherwise address or sustain her argument that the trial court had abused its discretion by awarding Edward $95,000 in appellate attorney's fees pending appeal.[7]

Moreover, the issue is ripe for review. In our analysis in the *Halleman* original proceeding, we contrasted the facts there with the facts of *In re Merriam*, 228 S.W.3d 413, 416 (Tex. App.—Beaumont 2007, orig. proceeding), in which the court of appeals held that the relator had an adequate remedy by appeal— and therefore was not entitled to mandamus relief—because the trial court order at issue did not require him to pay appellate attorney's fees until the conclusion of an unsuccessful appeal. *See Halleman*, 2011 WL 5247882, at *4–5. Here, having ordered the trial court to substitute language in the order awarding Edward appellate attorney's fees conditioned upon his success at the court of appeals and the supreme court, this case now stands in the same procedural posture as *Merriam* did, and like the relator there, who could challenge the

---

[7]Indeed, the memorandum opinion concluded by stating that we merely sustained Aimee's third issue "in part." *Halleman*, 2011 WL 5247882, at *6.

appellate attorney's fees "in his pending appeal from the final judgment," Aimee may challenge in this appeal from the final judgment the award of appellate attorney's fees pending appeal. *See Merriam*, 228 S.W.3d at 416.

Turning to Aimee's argument, Heather King testified at the hearing on Edward's motion for temporary orders pending appeal that she is a board certified family law attorney who handles trials and appeals involving divorces and that based on her experience, an award of appellate attorney's fees in the amount of $50,000 for defending the appeal at the court of appeals, $10,000 for defending against a petition for review at the supreme court, and $35,000 for full briefing at the supreme court would be reasonable and necessary. Edward testified that he was unemployed at the time of trial and that he was still unemployed; that he receives assistance from his family to pay bills; that Aimee had not paid him any part of the $50,000 judgment for attorney's fees awarded to him by the divorce decree; and that since the final trial, he had incurred additional expenses related to defending himself against "false" CPS allegations. Also, Edward is L.L.H.'s primary conservator and responsible for the debt owed on the residence. Although Aimee testified that her monthly bills slightly exceeded her net income, she is employed and confirmed that her mother "will pay" the costs associated with the appeal. Indeed, Aimee's mother paid Aimee's attorney's fees incurred at trial ($175,000) and paid appellate counsel a $25,000 retainer.

We hold that the trial court did not abuse its discretion by awarding Edward attorney's fees pending appeal as modified by our November 3, 2011

22

memorandum opinion and judgment. *See, e.g., In re Garza*, 153 S.W.3d 97, 101 (Tex. App.—San Antonio 2004, orig. proceeding) (holding that trial court had authority to award appellate attorney's fees because real party in interest "has primary responsibility for the children and for the care and upkeep of and the debt on the children's principal home"). In light of the modified award of attorney's fees pending appeal, Edward is entitled to $50,000 upon issuance of the mandate in connection with this appeal because he filed a brief in this court and we have affirmed the trial court's entire judgment. *See Halleman*, 2011 WL 5247882, at *5. Further:

- Edward will be entitled to $10,000 following the supreme court's final judgment denying a petition for review filed by Aimee in connection with this appeal if he files a reply to the petition for review pursuant to a request by the supreme court; and

- Edward will be entitled to $35,000 following the rendition of judgment by the supreme court if he files a brief pursuant to the supreme court's request for full briefing and the supreme court renders an opinion affirming this court's judgment in whole.

*See id.* Accordingly, we overrule Aimee's fifth issue.

## VII. CONCLUSION

Having overruled all of Aimee's issues, we affirm the trial court's judgment.

BILL MEIER
JUSTICE

PANEL:  GARDNER, MCCOY, and MEIER, JJ.

DELIVERED:  August 23, 2012