# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00753-CV

**Donald Edmund Dyer, Appellant**

**v.**

**Estela Trevino Dyer, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-FM-14-005909, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Following an agreement between the parties to bifurcate the case between jury and bench trial, the trial court signed a divorce decree dividing the community estate of appellant Donald Edmund Dyer and appellee Estela Trevino Dyer, giving Estela a majority of the community estate and ordering Donald to reimburse the community estate for certain expenditures.[1] On appeal, Donald argues that the evidence does not support the disproportionate division of the estate or some of the grounds for reimbursement. We reverse the portions of the decree dividing the estate and remand the case to the trial court to make a new division of property pursuant to this opinion.

---

[1] For the sake of clarity, we will refer to the parties by their first names.

## Standard of Review

A trial court must "order a division of the estate of the parties in a manner that the court deems just and right," Tex. Fam. Code § 7.001, and has broad discretion in making that division, *Penick v. Penick*, 783 S.W.2d 194, 198 (Tex. 1988); *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.). The trial court does not have to divide the community property equally, but the division must be equitable and the record must reflect a reasonable basis for an unequal division of the property. *O'Carolan*, 71 S.W.3d at 532. "To constitute an abuse of discretion, the property division must be manifestly unfair." *Id.* (citing *Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980)).

In exercising its discretion, the court may consider factors such as the parties' "earning capacities, education, business opportunities, physical condition, financial condition, age, size of separate estates, nature of the property, and the benefits that the spouse who did not cause the breakup of the marriage would have enjoyed had the marriage continued." *Id*. The trial court has the opportunity to observe the parties and other witnesses, determine credibility, and evaluate the parties' needs and potentials. *Murff v. Murff*, 615 S.W.2d 696, 700 (Tex. 1981). "Mathematical precision in dividing property in a divorce is usually not possible. Wide latitude and discretion rests in these trial courts and that discretion should only be disturbed in the case of clear abuse." *Id.* Although challenges to the legal and factual sufficiency of the evidence are not independent grounds of error, they are relevant factors when determining whether the trial court abused its discretion. *O'Carolan*, 71 S.W.3d at 532.

We also review a trial court's determination of a claim for reimbursement for an abuse of discretion. *Penick*, 783 S.W.2d at 198. We begin our review by presuming that the trial court exercised its "wide latitude and discretion" properly. *See Vallone v. Vallone*, 644 S.W.2d 455, 459-60 (Tex. 1982). Reimbursement claims are governed by equitable principles, Tex. Fam. Code § 7.007, and the trial court may not order reimbursement from a spouse's separate property solely to secure a just and right division of the community estate, *Heggen v. Pemelton*, 836 S.W.2d 145, 146 (Tex. 1992). The party seeking reimbursement has the burden of establishing the community estate's right to it. *Jensen v. Jensen*, 665 S.W.2d 107, 110 (Tex. 1984). However, the "payment by one marital estate of the debt of another creates a prima facie right of reimbursement," which is considered in light of offsetting benefits to the contributing estate. *Penick*, 783 S.W.2d at 196-98. "[I]t is well settled that a trial court may award a money judgment to one spouse against the other in order to achieve an equitable division of the community estate," but only "as a means for the wronged spouse to recoup the value of his or her share of the community estate lost through the wrongdoer spouse's actions." *Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998).

**Factual Summary[2]**

Estela and Donald started dating in August 2007, married in June 2010, and separated in September 2014. Estela filed for divorce in October 2014. At the time the parties started dating,

---

[2] The parties are familiar with the testimony and evidence presented to the jury and the trial court over the course of the eight-day trial. We thus only summarize the facts as necessary to explain our reasoning and will not provide a detailed recitation of the evidence. *See* Tex. R. App. P. 47.1.

Donald had already built several successful companies and was wealthy.[3] Estela was a single mother of three sons, was working two jobs, owned a house, and had a small retirement account. Her sons were attending a private high school, relying on financial aid and relatives to pay the tuition. Donald and his first wife divorced in 2008, and they shared custody of their youngest son, J.D., who was about nine. Donald bought Estela a car in 2008, encouraged her to quit her job, and started giving her about $4,000 per month. Donald testified that he did so because he wanted her to be able to spend more time helping her aging parents and so that he and Estela could spend more time together. Estela testified that he wanted her to quit her job so that she could travel with him, spend more time with him and J.D., and help entertain his business clients and their wives.

After the parties married, Donald initially gave Estela some credit cards but about a year later "decided that was not going to work," and started giving her a $10,000 monthly allowance. Estela testified that "the longer we were married, the more controlling he became" and that midway into the marriage, "it almost seemed like he would give me money depending on my behavior. If I was good and behaved, he would give me money. If not, if I displeased him, he wouldn't."

Estela's sons lost their financial aid when Estela and Donald married, and although Donald paid "some tuition" for her sons' private school, he did not pay for all of it, and Estela testified that Donald got angry when she used her allowance to pay for her sons' school tuition. Instead, Estela testified that with Donald's encouragement, she cashed in her retirement account and sold her house, although not for a large sum, and used those funds to pay her sons' tuition. Estela

---

[3] Estela introduced into evidence Donald's sworn inventory, in which he stated that one of the community's liabilities was a pledge he had made to a group called Texans First, that his pledge was for $298,500, and that the pledge represented "0.1% of net worth."

4

testified that her ex-husband paid some of the boys' educational expenses but not all that he had agreed to pay; she explained that her ex-husband, the father of her three sons, had several ailments and was not reliable. She also testified that one of her sons received a scholarship for some of his expenses and took out a student loan for the rest. Another son took a year off from school to work and save money "so as not to create any more stress between" Donald and Estela's ex-husband.

Donald testified that he and Estela's ex-husband originally agreed that they would each pay half of the boys' educational expenses but that the ex-husband did not follow through on his obligations, meaning that Donald had to pay for all of Estela's youngest son's high school education. He testified that he agreed to pay for a state-school college education but that Estela wanted her sons to go to private universities. Donald said he refused to pay more for their educations than he had for his own children and told them he would "not pay a penny more than whatever it says you can get an education at" the University of Texas. Donald agreed that he had refused to allow Estela to use her allowance to pay for her sons' tuition but testified that during the marriage, he paid approximately $300,000 toward Estela's sons' educations.

Estela testified that in late 2013, after many fights in which Donald "kept saying it was his money and saying [she] married him for his money," she took a part-time job to help pay for her sons' tuition, and that she quit when Donald threatened to divorce her, telling her by text that she was locked out of their bedroom and that she should sleep in another room that night. Donald stated that he was upset when she took the job only because it disrupted the family's holiday vacation plans and that he would have been fine with her working otherwise. Estela also testified that Donald once

got angry at her while they were in Colorado and locked her out of the house, leaving her to sleep in the cold on the front porch; Donald denied that the incident had taken place.

Donald testified that he controlled the bank accounts and credit cards and never added Estela to the accounts or opened any joint accounts. Both Estela and Donald called certified public accountants to testify. Estela's expert, William Bradley, explained that Donald's companies were "flow-through entities, meaning they don't pay any income taxes. They go on to the individual shareholder or partners' tax returns, and so the tax liability is paid at the individual level. So these entities don't pay taxes; the individual does." Companies with this tax structure are called "S corporations." *See* 26 U.S.C. § 1361 ("S corporation defined"). As explained by a federal tax court, "An S corporation is not subject to Federal income tax at the entity level. Instead, an S corporation's items of income, gain, loss, deduction, and credit—whether or not distributed—flow through to the shareholders, who must report their pro rata shares of such items on their individual income tax returns for the shareholder taxable year within which the S corporation's taxable year ends." *Kumar v. Commissioner of Internal Revenue*, 106 T.C.M. (CCH) 109, at \*2, 2013 WL 4080998 (U.S.T.C. 2013). Thus, the tax liability of such a company is a liability of a married shareholder's community estate, regardless of whether the company's earnings are distributed to the shareholder or retained in the company—referred to as "retained earnings."

Donald testified that he earned approximately $21 million pre-tax, about $13.5 million after tax, during his marriage to Estela. However, he said that although he paid taxes on the full amount, not all of that money went "into my personal checking account," and that the $21 million was "income that was from my tax estate. That was not income I actually received." Donald

6

testified that he decided how much to distribute to the community estate and how much to retain in the company and agreed when asked whether he had "started leaving more and more money in" his separate businesses since Estela filed for divorce. Although Donald did not provide any detail about how much he had increased his retained earnings after Estela filed for divorce, he introduced into evidence an expert report prepared by his CPA witness, Steve Pena. In that report, Pena stated that from 2011 through 2013, Donald's adjusted gross income ranged from about $3 million to $3.4 million, his "non-distributed income" ranged from about $112,000 to $184,000, and his taxes ranged from about $1 million to $1.3 million, resulting in almost $2 million in cash each year coming into the community estate. In 2014, Donald's adjusted gross income was more than $3.5 million, the "non-distributed income" was more than $1.7 million, and the taxes were almost $1.4 million, resulting in about $479,000 in cash to the community estate.

Estela testified that she had no control over or input into the couple's finances; that she never saw their full tax returns, only the signature page that Donald would give her to sign; and that she thought he earned "probably a couple of million" a year. Estela also testified that throughout their marriage, she and Donald had conflicts over his political contributions, particularly in light of him "giving me such a hard issue on what I use my allowance for, more specifically my children's education." She knew he actively contributed to a number of political causes but "did not realize the extent of the amount" donated during their marriage. Estela produced evidence showing that from August 2011 through December 2015, Donald contributed $776,729 to various political campaigns and causes and that about forty percent of that, $305,200, was donated in the year after

7

Estela filed for divorce. Donald testified that his political contributions benefitted his businesses, which, he asserted, in turn benefitted the community estate.

Donald testified about an investment he made in Motion Insight during the marriage, explaining that it was a technology company he helped start to develop equipment to track workers' movements and that he had invested about $150,000 in the company from community funds after he and Estela married. He said that the company had a patent and was still working on making functioning equipment but that it was "basically worthless at this point." He also agreed that the $150,000 loan was something that "the community company owes back to [Donald and Estela] as individuals." Estela testified that she had not been able "to obtain any information concerning that investment" other than Donald's testimony. She was asked whether she trusted Donald "that it might actually have some value at some point," and she answered, "No, I do not trust Don."

In Question 1, the jury was asked how much of the community estate was expended to benefit Donald's separate property, and with respect to income taxes paid by the community relating to Donald's four separate companies, it answered $841,108. In Questions 2 and 3, it answered that Donald's political contributions were unfair to the community estate and depleted the community estate in the amount of $305,200.[4] In the divorce decree, the trial court stated that a money judgment in favor of Estela was "necessary to reimburse the community estate for the amounts that the community estate benefitted the listed property of [Donald's] separate estate and for the amount of waste of the community estate by [Donald] and to make a just and right partition

---

[4] The jury was asked whether certain other expenditures by Donald were unfair to the community estate, but those items are not relevant to the appeal.

8

of the reconstituted community estate" and awarded her a $2,200,000 judgment.[5]  Donald requested

findings of fact and conclusions of law, as well as additional findings and conclusions after the trial

court's first filing.  The trial court filed amended findings and conclusions, in which it found that the

community estate was valued at $3,129,066, that the community paid $123,362 in insurance

premiums for Donald's separate life insurance policies, and that the loans receivable for Motion

Insight should be valued at $150,000.  The court did not make findings of fact or conclusions of law

related to income taxes or charitable contributions.  The trial court concluded that the community's

payment of the insurance premiums was a reimbursable expense and that Estela was entitled to a

disproportionate percentage of the community estate because of Donald's fault in the parties' break-

up, his superior resources and earning capacity, her loss of ongoing financial benefits that she would

have received had the marriage continued, the fact that Donald's separate estate was significantly

larger than the community estate and Estela's separate estate, and Donald's favoring his separate

businesses over the community estate throughout the marriage.  In its Characterization & Valuation

of Property, the court left blank a value for Motion Insight but valued the Motion Insight loans

receivable at $150,000.  In the section labeled "Equitable Claims—reimbursement, wasting, breach

of fiduciary duty, fraud, reconstituted," the trial court included $841,108 for income taxes paid for

Donald's separate companies.

---

[5]  The divorce decree recites that the parties agreed "to bifurcate the presentation issues between the jury and" the trial court, that "some questions of fact were submitted to the jury," that the parties "waived a jury on all questions of fact not presented to the jury, and all remaining questions of fact and of law were submitted to the [trial court] for determination."

## Income Taxes

Estela alleged in her petition that Donald had arranged for his companies to retain some of the pay he should have received from his separate companies and sought reimbursement for those undistributed funds and for income taxes paid by the community on the income of Donald's separate companies, stating that, "to the extent the Schedule E income on which these taxes were paid was undistributed, Estela Dyer requests reimbursement to the community estate for inadequate compensation for Donald Dyer's time, toil, talent, and effort by these business entities under the control and direction of Donald Dyer."  Bradley, Estela's expert, calculated that the community estate had paid $1,000,742 in taxes for Donald's companies and asserted that the community estate was entitled to reimbursement for that amount.  Pena, Donald's expert, said he did not agree that Estela was asserting a "recognized reimbursement claim" in seeking reimbursement for the taxes due from and paid by the community.  Even if the claim was a cognizable one, Pena further disputed Bradley's calculations, testifying:

> I found the correct number to be $841,108 . . . .  The premise for this, if you remember Mr. Bradley's testimony was that there was an amount of income that while the community had to pick it up, it stayed within those corporations.  It didn't benefit his separate corporation by building up the value.  Obviously, if you take it out, you have a lower value.  So it stayed in there, but the community had to pay taxes on it.  That's fine.  But what Mr. Bradley's report failed to calculate was the fact that during this period of time there was a number of distributions made out of those companies that he did not pick up on his report.  And those distributions, when you reduce the amount of so-called income left in the corporation and recalculate the tax, the tax is 841,000, not $1,000,742.

The jury was asked how much of the community estate was expended to benefit Donald's separate property, and in the portion of the question asking about "[i]ncome taxes paid by the community estate" for Donald's four separate companies, it answered $841,108. In its characterization and valuation of property, the trial court included that $841,108 in its valuation of the reconstituted community estate under the heading of "Equitable Claims—reimbursement, wasting, breach of fiduciary duty, fraud, reconstituted."

Donald argues that there was no evidence that the tax payments benefitted his separate estate because: Donald's separate entities do not have corporate tax burdens; the tax burden instead passes through to Donald as an individual and, during the marriage, to the community estate; any consequences of a failure to pay taxes lies with Donald and, during the marriage, the community estate; and, therefore, the use of community funds to pay the taxes provided no benefit to the companies themselves.

It is true that the tax burden in this case was properly the community estate's burden, regardless of whether Donald opted to retain or disburse the companies' earnings.[6] Thus, the only question is whether the trial court could properly have determined that the separate estate was

---

[6] Donald admitted that toward the end of the marriage, he retained more earnings rather than distributing the funds to the community estate. Although the tax liability associated with those retained earnings was owed and paid by the community, the retained earnings remained the property of the entities that are Donald's separate property. *See Thomas v. Thomas*, 738 S.W.2d 342, 344 (Tex. App.—Houston [1st Dist.] 1987, writ denied) ("Subchapter S status does not determine who owns the corporation's earnings. It merely provides an alternate method to tax the corporation's income. A Subchapter S corporation may distribute its income, but, like any other corporation, it is not required to do so. . . . [W]hile the corporation retained some earnings as 'previously taxed income' of the shareholders, the earnings remained the corporation's exclusive property and never belonged to the appellant or the marital estate.").

11

enriched by the community estate so as to permit reimbursement. In general, where the community funds are used to pay a community debt, no right to reimbursement can be asserted. *See In re Marriage of Gill*, 41 S.W.3d 255, 258-59 (Tex. App.—Waco 2001, no pet.) (reimbursement award improper where "community funds were used to pay a community obligation"); *see also Vallone*, 644 S.W.2d at 459 ("A right to reimbursement arises when the funds or assets of one estate are used to benefit or enhance another estate without itself receiving some benefit."); *Cockerham v. Cockerham*, 527 S.W.2d 162, 171 (Tex. 1975) ("debts contracted during marriage are presumed to be on the credit of the community and thus are joint community obligations, unless it is shown the creditor agreed to look solely to the separate estate of the contracting spouse for satisfaction"). It is undisputed that the tax liability in question was a community debt. *Cf. Thomas v. Thomas*, 738 S.W.2d 342, 344 (Tex. App.—Houston [1st Dist. 1987, writ denied) (declining to adopt wife's argument that S corporation's retained earnings should be treated as community property because community estate paid income tax on earnings).

The family code provides for a reimbursement claim for "inadequate compensation for the time, toil, talent, and effort of a spouse by a business entity under the control and direction of that spouse," Tex. Fam. Code § 3.402(a)(2), and Estela referred to such a claim in her petition. However, the jury charge asked only whether the "income taxes" benefitted Donald's separate property, with no question or instruction pertaining to retained earnings or inadequate compensation. Courts have determined that the mislabeling of an award, for instance as reimbursement instead of economic contribution, does not require reversal if the pleadings, evidence, and implied findings support the proper award. *See Sikes v. Sikes*, No. 11-08-00296-CV, 2010 WL 2112809, at *4 (Tex.

12

App.—Eastland May 27, 2010, no pet.) (mem. op.); *Garcia v. Garcia*, 170 S.W.3d 644, 652 (Tex. App.—El Paso 2005, no pet.). However, in this case, the trial court included the jury's exact finding in its valuation of the reconstituted community estate under the heading of "Income taxes paid on [Donald's] Sch E income 2010-2014—jury VERDICT." We therefore can only conclude that the trial court based its $841,108 reimbursement award on the community's income tax payments, not on any wrongfully retained earnings or inadequate compensation.

This case presents a difficult question, one that appears not to have been addressed before. However, the law guides us to the conclusion that a claim for reimbursement cannot be made when the debt paid by community funds was a community debt, *see In re Marriage of Gill*, 41 S.W.3d at 258-59, in this case, income taxes owed by the community. The trial court erred in ordering the community estate reimbursed for the community's payment of income taxes it rightfully owed. *See Thomas*, 738 S.W.2d at 344-45 (observing "that the marital community benefits from the Subchapter S election" because "the community avoids having dividends taxed twice, first as corporate income, and then, upon receipt, as personal income," "the corporation has more money to distribute as dividends," corporate tax credits and losses reduce community's taxable income, and shareholders are protected from personal liability).

### Political Contributions

We next consider whether the court properly ordered the community reimbursed for the political contributions Donald made during 2015. The jury found that Donald's political contributions were not "fair to the community estate" after being instructed that it should consider the relationship between Donald and the recipients, any special circumstances justifying the

13

donations, and whether the amounts of the donations were reasonable in proportion to the overall community estate. The jury found that the community estate was unfairly depleted by $305,200 as a result of those contributions.

"A fiduciary duty exists between a husband and a wife as to the community property controlled by each spouse." *Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no pet.). As long as he does not work a fraud on the rights of the other spouse, a spouse has the right to control and dispose of community property subject to his sole management. *Massey v. Massey*, 807 S.W.2d 391, 401 (Tex. App.—Houston [1st Dist.] 1991), *writ denied*, 867 S.W.2d 766 (Tex. 1993). A spouse's disposition of the community property must be fair to the other spouse, and "[t]he managing spouse has the burden to show that his disposition of the property was fair." *Id.* at 402; *see Jean v. Tyson-Jean*, 118 S.W.3d 1, 9 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). "A presumption of 'constructive fraud,' i.e., waste, arises when one spouse disposes of the other spouse's interest in community property without the other's knowledge or consent." *Puntarelli v. Peterson*, 405 S.W.3d 131, 137-38 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "The presumption may arise even when the other spouse has knowledge of the disposition, so long as she did not also consent to the disposition." *Everitt v. Everitt*, No. 01-11-00031-CV, 2012 WL 3776343, at *3 (Tex. App.—Houston [1st Dist.] Aug. 31, 2012, no pet.) (mem. op.). Once the presumption arises, the disposing spouse must prove that his disposition of the community property was not unfair. *Puntarelli*, 405 S.W.3d at 138. A claim of constructive fraud is evaluated by looking to several factors, "including the size of the gift in relation to the total size of the community estate; the adequacy of the estate remaining to support the wife, the gift notwithstanding;

14

the relationship of the donor to the donee; and whether special circumstances existed to justify the gift." *Barnett v. Barnett*, 67 S.W.3d 107, 126 (Tex. 2001); *see Everitt*, 2012 WL 3776343, at *3.

Donald argues that political contributions are a form of civic engagement and the exercise of his first amendment rights, that his businesses profited by his contributions, and that the $305,200 was reasonable in light of the overall $3 million community estate. He further contends that because he made political contributions throughout the marriage and Estela was involved with some aspects of his political activities, his contributions were simply a continuation of his "established political involvement" and "embraced political organizations in which both Estela and [Donald] participated." Thus, he asserts, the jury could not reasonably have found that those contributions were unfair to the community estate.

However, Estela testified that throughout the marriage, she and Donald fought about his political donations, saying, "I could not fathom how he could give—I knew he was giving a lot of money and—but then he would give me such a hard time about using my allowance to pay for my boys' tuition, education. And we'd have fights about that, that his political connections and political organizations are more important than his love for me or than his wife." She also said she did not know how much Donald had contributed to political causes and was "appalled" when during the divorce she learned of the extent of his donations.

Donald argues that because his political contributions led to legislation and other political action favorable to his companies, those contributions benefitted the community estate. However, this does not take into account that the jury only found fault with his donations made in 2015, after Estela filed for divorce. Thus, assuming that the record supports a conclusion that the

15

donations led to political action benefitting Donald's companies, the jury could have determined that his increased post-divorce-filing donations made from the community estate would primarily have benefitted his separate estate. Giving great deference to the jury's role in determining the credibility of the witnesses and the weight to give their testimony and in resolving evidentiary conflicts, the record reflects that there was sufficient evidence to support the jury's determination that Donald's most recent $302,500 in political donations were unfair to the community estate. *See Haining v. Haining*, No. 01-08-00091-CV, 2010 WL 1240752, at \*13 (Tex. App.—Houston [1st Dist.] Mar. 25, 2010, pet. denied) (mem. op.) (trial court as factfinder chose to credit wife's testimony related to reimbursement).

Alternatively, Donald contends that even if some of his contributions could be considered waste, it was improper for the jury to find that all of his contributions made after Estela filed for divorce were waste. Instead, he insists, the most the jury could have found as waste was $186,818: $305,200 less $118,382, which was the average of the annual sums donated in the preceding four years. He asserts that although Estela may not have known the exact amount Donald was giving before the divorce proceeding began, her "knowledge and actions necessarily constitute implicit consent to this level of giving." However, the evidence is undisputed that Estela had no control over any of the couple's finances, and she testified to ongoing conflict related to the political spending. The jury could have determined that Estela did not implicitly consent to Donald's pre-divorce spending.

In our review of the legal and factual sufficiency of the evidence, we must bear in mind that the jury was the sole judge of the credibility of the witnesses and the weight to be given

16

their testimony, and we may not substitute our judgment for the jury's, even if we might reach a different answer on the evidence. *See In re P.A.C.*, 498 S.W.3d 210, 214 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Halleman v. Halleman*, 379 S.W.3d 443, 447 (Tex. App.—Fort Worth 2012, no pet.). Under the applicable standards of review, the jury had sufficient evidence on which to base its determination. Further, Donald has not shown that the trial court abused its discretion in incorporating the jury's findings related to Donald's 2015 charitable contributions in its calculation of the community estate. *See Penick*, 783 S.W.2d at 197-98 (appellate court should give great latitude to trial court's application of equitable principles to reimbursement claims); *In re Marriage of Donathan*, No. 10-16-00014-CV, 2017 WL 3298943, at *4 (Tex. App.—Waco Aug. 2, 2017, no pet.) (mem. op.) ("When a reimbursement award does not appear to be unjust, there is no abuse of discretion."); *Nelson v. Nelson*, 193 S.W.3d 624, 632 (Tex. App.—Eastland 2006, no pet.) ("The discretion to be exercised in evaluating a claim for reimbursement is equally as broad as the discretion exercised by a trial court in making a just and proper division of the community estate."); *Raulston v. Raulston*, 531 S.W.2d 683, 684-85 (Tex. Civ. App.—Texarkana 1975, no writ) (trial court has broad discretion to award reimbursement for fraud); *see also Fanning v. Fanning*, 828 S.W.2d 135, 148 (Tex. App.—Waco 1992), *rev'd in part on other grounds*, 847 S.W.2d 225 (Tex. 1993) (husband admitted that he donated $40,000 to charity shortly before trial; court held that "trial court rightfully could have considered the circumstances and timing of the charitable contributions in finding that such a disposition of community funds was unfair to the rights of" wife).

## Motion Insight Loan

Donald testified that he helped start Motion Insight, investing about $150,000. Although he testified that it was "basically worthless at this point," the evidence was that the company held a patent and was still working on the equipment, and Estela testified that she had not been able to get information about Motion Insight from Donald and did not trust his assertion about the company's value. Based on this scant evidence, which allows for the possibility that the company's efforts might yet be worth something in the future, we cannot hold that the trial court abused its discretion in determining both that the community's interest in the company should be awarded to Donald and that the accounts receivable should be valued at $150,000.

## Insurance Premiums

Donald next complains that the trial court erred in ordering the community estate reimbursed for $123,362 paid for insurance premiums owned by Donald as separate property, arguing that the evidence showed that the community was already reimbursed for $75,325 in premiums paid on "key man" premiums.[7] We agree.

Donald testified, "I pay the premiums personally. And then the company reimburses me after I pay the premium." He was asked more specifically about evidence showing that the community estate paid his key-man premiums, and he said, "They were reimbursed for all those—premiums." Donald's business partner echoed that testimony, stating that it was the

---

[7] "Key man" policies provide "protection to the company for the loss of a key man" and can provide funds for the purchase of a key man's interest in a business in the event of his death. *See Seymour v. American Engine & Grinding Co.*, 956 S.W.2d 49, 53, 58 (Tex. App.—Houston [14th Dist.] 1996, writ denied).

companies' "general policy" to reimburse for such premiums. Estela argues that the trial court could have determined that Donald was not credible and thus disregarded that testimony. However, Donald's testimony was unequivocal, clear, direct, and positive, it was not opinion testimony, and there were "no circumstances in evidence tending to discredit or impeach" Donald's testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Because there was no evidence raising a conflict on the issue, the trial court erred in determining that the community estate was entitled to reimbursement for the $75,325 in premiums paid for Donald's key-man policies. Instead, as Donald concedes, the community was only entitled to reimbursement for $48,037 in premiums.

### Disproportionate Division of the Community Estate

The trial court awarded Estela $2,200,000—seventy percent of the $3,129,066 community estate. Donald argues that because Estela did not allege that Donald had physically abused her, concealed assets, or committed other egregious acts, the trial court's division of the community estate was an abuse of discretion.

The law provides the trial court with broad discretion to determine a just and right division of the community estate. *Halleman*, 379 S.W.3d at 452; *O'Carolan*, 71 S.W.3d at 532. However, because the errors in the trial court's reconstitution calculations may have affected its just and right division of the community estate, we will remand the matter to the trial court for new determinations of how the estate should be divided. *See Jacobs v. Jacobs*, 687 S.W.2d 731, (Tex. 1985) ("a court of appeals must remand the entire community estate for a new division when it finds reversible error which materially affects the trial court's 'just and right' division of the

19

property"); *Delancey v. Delancey*, No. 03-10-00240-CV, 2011 WL 677401, at *7 (Tex. App.—Austin Feb. 24, 2011, no pet.) (mem. op.) (same).

## Conclusion

The trial court erred in including the jury's finding as to income tax payments made by the community in its valuation of the reconstituted community estate and in its calculation of reimbursement due to the community estate for its payment of Donald's separate insurance policies. We therefore reverse the portions of the divorce decree related to the division of property; we affirm the remaining uncontested portions of the decree. We remand the cause to the trial court for a new determination and division of the community estate.

_____

Cindy Olson Bourland, Justice

Before Justices Puryear, Field, and Bourland

Affirmed in Part; Reversed and Remanded in Part

Filed: June 15, 2018