02-11-406-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00406-CV

 

 


 
 
 In
 the Interest of R.H., J.B., and T.B.
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From the 325th District
 Court
  
 of
 Tarrant County (325-458396-09)
  
 March
 14, 2013
  
 Opinion
 by Chief Justice Livingston
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Chief Justice Terrie Livingston

 

 

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00406-CV

 

 


 
 
 In the Interest of R.H., J.B., and T.B.
 
 


 

 

----------

FROM THE 325th
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

          Pro
se appellant J.B. (Father) appeals the trial court’s order that appointed him
and A.M.H. (Mother) as joint managing conservators of their three children and
that gave Mother the right to designate the children’s primary residence.  Father
contends that the evidence is legally and factually insufficient to support the
trial court’s judgment.  We affirm.

Background Facts

          Mother
and Father, who were married at the time of the trial, have three sons together: 
R.H. (Randy), born in August 2004; J.B. (Jacob), born in November 2006; and T.B.
(Tim), born in August 2008.[2]  According to Father, in
2009, he and Mother separated because she had an extramarital affair, and he
became the primary caretaker of the boys, therefore providing for them “emotionally,
physically, [and] financially.”  From May 2009 until March 2011, Father
possessed the children and took them to various activities, including school,
sports, and birthday parties.  Father testified that during the time that he
possessed the children, he encouraged Mother to visit them, but she usually did
not do so.  Mother testified that during that time, she bought clothes and toys
for the children, and they visited her at her apartment.

          In
May 2009, Father filed an original petition seeking sole managing
conservatorship of the children and asking the trial court to name Mother as a
possessory conservator.  Father also asked the trial court to require Mother to
pay child support, and he sought a temporary restraining order against her to
prohibit her from, among other actions, disturbing the “peace of the
children.”  In October 2009, Father filed another petition, again seeking sole
managing conservatorship of the children.  Father’s October 2009 petition
referenced an October 7, 2009 order entered by an associate judge.[3] 
Father later sought enforcement of the October 7 order, referring to it as a
restraining order and arguing that Mother had violated its terms.

          In
June 2010, the trial court designated Father as the temporary sole managing
conservator of the children.[4]  In March 2011, pursuant
to Father’s guilty plea for an offense that had occurred in July 2008, a
district court convicted him of possessing a forged check with the intent to
pass it, which is a state jail felony.[5]  The district court
sentenced Father to six months’ confinement.  Before serving his sentence,
Father sold a car to provide financial support for the children.

          Father
did not tell Mother about his confinement because he believed that she did not
have a stable place for the children to stay and that she was in a relationship
with someone “who . . . the children should not be around.”  Thus, initially
upon Father’s confinement, the children lived with his family.  According to Mother,
between March 2011 and May 2011, Father’s family schemed to keep the children
away from her by, among other acts, sending text messages from Father’s cell
phone while pretending to be him.  Mother did not know about Father’s
confinement until a couple of months after he had been in jail.

          In
May 2011, a court-appointed amicus attorney filed a motion to modify the June
2010 temporary order, noting that after the trial court had issued the order,
Father had been confined.  The trial court, reversing its previous temporary
order, appointed Mother as the temporary sole managing conservator, named Father
as the temporary possessory conservator, and stated that Father could have “no
possession and access of the children” until further order of the court.  The
court also set a trial date on the custody of the children for September 2011.

          Mother
kept the children from May 2011 until September 2011 with some assistance from
Father’s sister when Mother went to work.  Father testified at trial that after
his release from confinement in early September 2011, he spoke to the children
as much as he could, but Mother restricted his ability to see them.  Mother
testified that after Father was released from confinement, she took the children
to see him a “few times.”

          Before
the trial occurred, Father asked the trial court to name him as a joint
managing conservator of the children with the exclusive right to establish
their primary residence.  At the time of the trial, Tim and Jacob were in
prekindergarten, and Randy was in the second grade.  Following the trial, in
which Father, Mother, and the amicus attorney appeared, the trial court entered
an order naming Father and Mother as joint managing conservators, stating that
Mother could designate the children’s primary residence, ordering that Father
could have possession of the children at designated times and on other
occasions as agreed upon by the parties, and requiring Father to pay $345 per
month in child support.[6]  Father appealed.

The
Propriety of the Trial Court’s Final Custody Order

          In
a concise pro se brief, Father principally contends that the trial court erred
by finding that the children’s best interests required Mother’s designation as their
primary caregiver.  Specifically, Father appears to argue that the trial
court’s decision to allow Mother to designate the children’s primary residence was
not based on legally or factually sufficient evidence.

          As
we recently explained, 

          We review the trial court’s decisions on
custody, control, possession, and visitation matters for an abuse of
discretion.  Newell v. Newell, 349 S.W.3d 717, 720 (Tex. App.—Fort Worth
2011, no pet.).  To determine whether a trial court abused its discretion, we
must decide whether the trial court acted without reference to any guiding
rules or principles; in other words, we must decide whether the act was
arbitrary or unreasonable.  Low v. Henry, 221 S.W.3d 609, 614 (Tex. 2007);
Cire v. Cummings, 134 S.W.3d 835, 838–39 (Tex. 2004).  Legal and factual
sufficiency are not independent grounds of error in this context, but they are
relevant factors in deciding whether the trial court abused its discretion.  In
re T.D.C., 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op.
on reh’g).

Halleman
v. Halleman, 379 S.W.3d 443, 447 (Tex. App.—Fort Worth
2012, no pet.); see also Strong v. Strong, 350 S.W.3d 759, 765 (Tex.
App.—Dallas 2011, pet. denied) (“The trial court is vested with broad
discretion to determine which conservator will have the exclusive right to
establish the child’s primary residence.”).

          A
trial court does not abuse its discretion on factual matters “as long as some
evidence of a substantive and probative character exists to support the trial
court’s decision.”  In re W.M., 172 S.W.3d 718, 725 (Tex. App.—Fort
Worth 2005, no pet.).  In determining whether there has been an abuse of
discretion because the evidence is legally or factually insufficient to support
the trial court’s decision, we review whether the trial court had enough
information upon which to exercise its discretion and whether the trial court
erred in applying its discretion.  Id.  “The traditional sufficiency
review comes into play with regard to the first question. With regard to the
second question, we determine, based on the elicited evidence, whether the
trial court made a reasonable decision.”  Id.

          An
appellate court cannot conclude that a trial court abused its discretion merely
because the appellate court would have ruled differently in the same
circumstances.  M.M.M., 307 S.W.3d at 849.  We must be cognizant that
the trial court is in a better position to decide custody cases because “it faced
the parties and their witnesses, observed their demeanor, and had the
opportunity to evaluate the claims made by each parent.”  In re J.R.D.,
169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied).

          When
a trial court appoints parents as joint managing conservators of a child, it must
give one of them the exclusive right to determine the child’s primary
residence.  Tex. Fam. Code Ann. § 153.134(b)(1) (West 2008).  The best interest
of the child is the “primary consideration of the court in determining the
issues of conservatorship and possession of and access to the child.”  Id.
§ 153.002 (West 2008); see also Holley v. Adams, 544 S.W.2d 367,
372 (Tex. 1976) (reciting factors that courts may consider in determining the
best interest of a child); Sano v. Greenlee, No. 02-10-00264-CV, 2011 WL
2436737, at *7 (Tex. App.—Fort Worth June 16, 2011, no pet.) (mem. op.) (applying
the Holley factors to a trial court’s determination of which conservator
had the exclusive right to designate a child’s primary residence).

          Based
on the evidence that the trial court received, it issued a finding of fact that
it is “in the best interest of the children that . . . Mother should have the
right to establish [their] primary residence.”  In making that finding, the
trial court stated that it had considered, among other factors, the parents’
qualifications “without regard to their gender,” the physical and emotional
needs of the children, Mother’s and Father’s parenting abilities, the stability
of their homes, their acts and omissions reflecting on the propriety of their
relationships with the children, and their ability, “or lack thereof, to
encourage a positive relationship between the child[ren] and the other parent.”

          Each
parent has a criminal history.  Mother has three felony convictions related to
burglary and engaging in organized criminal activity.  In the burglary case,
she pled guilty, but she testified at the trial of the custody case that she had
not committed the crime and that she had pled guilty only because she was twenty-two
years old and she had been advised that she should not try to contest the
charge.  At the time of the trial, Mother was serving a term of ten years’
community supervision.

          Father
committed the offense of possessing while intending to pass a forged check in
July 2008 (about a month before Tim was born), and he was convicted and
sentenced to 180 days’ confinement in state jail for that offense in March
2011.  Father explained that his 2011 conviction was based on him taking a copy
of a check, scanning it, printing it out on “[c]heck paper,” and making a
duplicate.  He admitted that he had done this between five and ten times and
that he had planned on using the forged checks “[t]o get some money.”  Father has
also been convicted three times for driving with a suspended license (in 1994,
1997, and 2001) and once for unauthorized use of a motor vehicle (in 1992).  Father
received probation for the latter offense, but he later violated the probation’s
conditions and served approximately two years in prison.

          The
evidence also established acts of each parent, beyond their criminal histories,
that a factfinder could have weighed against them in its custody determination. 
For example, from 2009 until the trial in September 2011, part of which time
Mother did not possess the children, she changed residences five times.  Mother
could not live in an apartment at the time of the trial because she had been
previously evicted, she had a criminal background, and she did not have enough
money to pay a deposit and rent.  Thus, on the trial date, Mother had been
living with the children in a homeless shelter for almost two months.  Father
testified that Mother had told him that Randy “wasn’t eating like he used to”
and had lost weight while Father was confined.

          At
the time of the trial, Mother was in a relationship with a man that she had met
at the homeless shelter, and that man had babysat the children on a few
occasions.  According to Father, Randy told Mother that he did not like her
dating the man in the shelter.  Father testified that Mother “like[d] to go out
to clubs, leaving the children with a babysitter while she [went] out.”

          Father
admitted that he had used illegal drugs and had been arrested for possessing
drug paraphernalia in the past but stated that he had last used drugs in 2008
and that if the trial court had given him a drug test on the day of the trial,
he would have passed it.  Mother testified, however, that Randy had described
seeing Father “putting green stuff off into a metal thing, twisting it[,] . . .
and then smoking it.”

          Mother
also testified that Randy had stated that when Father had possessed the
children, he had taken naps while two of the children were awake and had told
Randy to “put something in the microwave” if he was hungry while Father was
napping.  Mother opined that Father was a good father with respect to finances
but that the way he got his income—by forging checks—was “not the right way.”  The
evidence reflects that based at least in part on information that the police received
from Mother about Father doing “illegal things,” Father’s computer and printer
were seized in 2010 at the same time of his arrest for possession of a forged
check with the intent to pass it.  According to Mother, after Father was
released from jail, he “didn’t have any money”; Father testified that he also
did not possess a car or a valid driver’s license at the time of the trial.[7]

          When
Mother gave birth to Randy, she was only fifteen years old, and Father was
thirty-three years old; Father recognized that he had committed a crime by
having sex with Mother when she was underage.  Father testified, however, that
he had learned of Mother’s age only after he had discovered that she was
pregnant.

          Mother
believed that Father often acted with spite and had temper tantrums toward her
rather than acting for the benefit of the children.  For example, Mother
testified that Father had sought fifteen or sixteen protective orders against
her and that he had called Child Protective Services about her.  Mother expressed
that through the litigation in the trial court, Father was using the children
“as a rag doll.”  Once Mother obtained possession of the children in 2011, she
had trouble getting their food stamps because Father’s family would not give
them to her.  According to Mother, on Christmas in 2010, she was entitled to
possession of the children, but Father hid them from her and would not tell her
where they were.[8]  When Father lived in
Mansfield with the children, he did not tell Mother his address because he did
not want her to know it.  Father’s sister, Regina, admitted that when Father
went to jail in March 2011, she kept the children away from Mother by being
dishonest with her.

          The
trial court also received evidence that it could have weighed in favor of each
parent’s request to obtain primary custody of the children.  For example, although
Mother had been living with the children in a homeless shelter for a sustained
period of time on the date of the trial, she had maintained a job for two years,
making $7.50 per hour, by being on call for clients who needed home health
assistance.  Mother did not own a car, but she had been using Father’s car to
go to work.  Mother described the homeless shelter that she was living in as

a program that helps people get on their feet. . . .  It
allows you 12 months to save up your money.  You don’t have to spend a dime out
of your pocket.  You eat there.  You sleep there. . . .  So everything that you
have . . . coming from your income, you can put it off into savings.  And so,
when you get ready to leave the program, you won’t have to, you know, fall back
or be homeless again.

At
the shelter, Mother took classes about how to be a proper parent and how to
manage money.  The children also took classes at the shelter in which they
worked with computers or participated in arts and crafts.  The shelter paid for
Randy to attend the Boys & Girls Club after school every day.  Mother said
that she was eligible for housing from the Arlington Housing Authority, which
would likely contact her within two to three months after the trial occurred to
arrange for her to have a home that she and the children could live in.

          Johnny
Allen, a military police officer who knew Mother and the children through the
shelter, testified that he had mentored the children and had seen positive
developments in them since they arrived there.  Allen stated that the shelter

is there to help people.  [There are] programs put in
place . . . [and] there’s a step-by-step process that the people that live
there [go] through. . . .  [E]verybody has a criminal background check done on
them the minute that they get there.  If you’re not up to standards, you don’t
come in there.

          . . . .

          . . . [T]he environment is set up to where you
will succeed.

          Mother
opined that it was in the children’s best interests to live with her because
she would not “drag them through” situations like Father had.  She testified
that she did not know how many of the children’s sporting events she had
attended before receiving possession of them, but she knew that Randy had
played baseball, football, and basketball and that Jacob had played football.  Randy’s
sports coach testified that Father had actively participated in Randy’s sports
activities.

          Randy’s
first grade teacher, Latia Lewis, testified that Randy was a bright student and
that he had no behavior problems.  Lewis said that Father came to Randy’s
school “a few times throughout the school year,” that Father was very involved
in Randy’s education, and that she had never met Mother.  Lewis also stated,
however, that Father eventually withdrew Randy from the school.[9]

          Father’s
former boss testified that Father had prioritized his children over his job,
that Father was nice to the children, and that Father had cooked for them.  Father’s
aunt, Pamela, testified that before March 2011, Father had cared “very well”
for the children for more than eighteen months and that when Father went to
jail, he said that he wanted Mother to be able to see the children on the
weekends but that he did not want the children’s school and day care routines
to be interrupted.  Like Mother, Father had taken some parenting classes. 

          Father
testified that he had spoken with the children and that if “they had a choice,
they would all say that they want to live with [him]” at the home where they had
lived before he went to jail.  Father testified that he loved his children and
that he would do anything for them.  Mother recognized that the children loved
Father, explaining that when he got out of jail, she took them to visit him and
they “almost jumped out of the car while it was moving.”  According to Mother, the
children had expressed that they wanted to live “[w]ith Daddy and Mommy.”

          Regina,
who cared for the children from March to April 2011 while Father was confined,
opined that the children’s best interests would be served by Father and Mother
sharing custody of them.  When Father went to jail, Regina began to have a good
relationship with Mother, and Mother and the children stayed with her for
several weeks.  Regina expressed that she did not ever see Mother being a bad
parent to the children.  Regina testified that she saw the children a couple of
weeks before the trial began and that they looked like they were happy and were
being taken care of.

          Father
explained that he could provide for the children financially and that his
employment could provide flexibility to care for them.  He testified that if he
possessed the children, he would enroll them in a public school and in day care
and use Medicaid to pay for their healthcare.

          Considering
all of these facts, we cannot conclude that the trial court abused its
discretion by giving Mother the right to designate the children’s primary
residence; there is at least “some evidence of a substantive and probative
character . . . to support the trial court’s decision.”  W.M., 172
S.W.3d at 725.  Specifically, although a factfinder could have weighed some of
the evidence summarized above in Father’s favor, the trial court could have
reasonably determined that it was in the children’s best interest for Mother to
be their primary caregiver because Father had a more prolonged and diverse criminal
history than she did; he had an apparent pattern of attempting to reduce her
involvement in the children’s lives; he was not working at a stable job at the
time of the trial like she was and, according to her, did not have money; he
had used illegal drugs in the past while there is no evidence that she had; and
he did not possess a car or a driver’s license to be used in transporting the
children.  Furthermore, the trial court could have reasonably preferred Mother
because she had been taking classes at the shelter to become a better parent
and because the children appeared to be doing well in her care at the time of
the trial, as conceded by Regina.

          For
these reasons, although we recognize that the evidence at trial presented a
close case, to the extent that Father argues that the trial court abused its
discretion by allowing Mother to designate the children’s primary residence, we
overrule that argument.  See id.

          In
his brief, relying on section 153.003 of the family code, Father also appears
to assert that the part of the trial court’s judgment that orders him to pay
child support is discriminatory because the court did not order Mother to pay
child support earlier in the litigation.  See Tex. Fam. Code Ann. § 153.003(3)
(West 2008) (stating that a trial court shall not consider the gender of the
parent in determining the terms and conditions of conservatorship and
possession of a child).  While making this argument, Father refers to a “trial”
that he claims occurred in December 2009, but the reporter’s record does not
contain a transcript of any such proceeding, and the clerk’s record does not
contain a December 2009 order.  Thus, we cannot discern the rationale behind
any decision of the trial court concerning temporary child support, and we
cannot determine the merits of Father’s apparent contention that the trial
court erred by failing to require Mother to pay child support in December 2009
while ordering him to pay it later.[10]  We overrule that
argument.

          Finally,
in one sentence in the “SUMMARY OF ARGUMENT” part of his brief, Father argues
that “all parties were not notified of trial, specifically the Office of the
Attorney General.”  The Attorney General intervened in the suit in September
2009, asking the trial court to make appropriate orders for conservatorship and
support of the children, but according to the record filed in this court, the
Attorney General did not otherwise appear in the trial court before or at the
September 2011 trial.  After the trial concluded, the Attorney General
nonsuited its intervention.  Father has not cited any legal authority
indicating that the parties’ apparent failure to give the Attorney General notice
of the trial requires a reversal of the trial court’s judgment, and we have
found none.  Thus, we overrule Father’s last argument as inadequately briefed. 
See Tex. R. App. P. 38.1(i); Allegiance Hillview, L.P. v. Range Tex.
Prod., LLC, 347 S.W.3d 855, 873 (Tex. App.—Fort Worth 2011, no pet.).

Conclusion

          Having
overruled each of Father’s arguments on appeal, we affirm the trial court’s
judgment.

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL:  LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

 

DELIVERED: 
March 14, 2013









[1]See Tex. R. App. P. 47.4.





[2]To protect the anonymity
of the children, we will refer to them through pseudonyms.  See Tex.
Fam. Code Ann. § 109.002(d) (West Supp. 2012); In re M.M.M., 307 S.W.3d
846, 848 n.1 (Tex. App.—Fort Worth 2010, no pet.).





[3]This order is not in the
appellate record. 





[4]The trial court’s June
2010 order is likewise not in the record, but it is referenced in a later
document. 





[5]See Tex. Penal Code
Ann. § 32.21(a)(1)(C), (c)–(d) (West 2011).  Father was first arrested for the
forgery offense in October 2010.





[6]From our review of the
record, it appears that the trial court’s October 3, 2011 order is
the first final order concerning the custody of the children.





[7]A man who had employed
Father most recently in November 2010 at a rate of between $200 and $250 per
week testified that Father could work for him again.  Father’s 2010 tax return
shows that he netted approximately $14,000 in 2010.





[8]Father disputed that he
would not let the children see Mother on holidays.





[9]Randy missed school in part
of April and May 2011.  Mother said that the reason she did not return Randy to
the school was because she did not “want any of [Father’s] family members
coming up there and . . . running off with him.”  To avoid failing a grade,
Randy attended the last week of school for the 2010/2011 school year.





[10]We note, however, that in
the trial court’s June 2011 order that named Mother as the children’s temporary
sole managing conservator and Father as their temporary possessory conservator,
the trial court did not require Father to pay child support because the court
found that it was “in the best interest of the children that no [temporary]
child support be ordered.”