

# NUMBER 13-22-00463-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CHAD SCHAEFER,                                                **Appellant,**

**v.**

AMBER LYNN SCHAEFER,                                     **Appellee.**

## On appeal from the 135th District Court
## of Victoria County, Texas.

# MEMORANDUM OPINION

**Before Justices Tijerina, Silva, and Peña**
**Memorandum Opinion by Justice Silva**

Appellant Chad Schaefer[1] appeals from the final decree of divorce from appellee Amber Lynn Schaefer, which includes property divisions and orders relating to child support, possession, and access of their minor child, M.S. By six issues which we

---

[1] Appellant's name also appears in the record as "Chadley Schaefer."

construe as five, Chad argues the trial court erred by (1) instituting a 150-mile geographic restriction for M.S.'s primary residence; (2) ordering him to pay child support in excess of the child support guidelines under the Texas Family Code; (3) disregarding the parties' premarital agreement; (4) awarding Amber his separate property and unequally dividing the community property; and (5) awarding unconditional appellate attorney's fees to Amber. We affirm in part, affirm as modified in part, reverse and render in part, and reverse and remand in part.

## I. BACKGROUND

Chad filed his original petition for divorce from Amber on a no-fault basis. Chad's petition alleged that the parties had entered into a premarital agreement, which was attached as an exhibit, and asked the trial court to enforce the agreement when dividing the marital estate. Otherwise, Chad requested that the trial court divide the community estate in a just and right manner. As to M.S., Chad's petition merely requested the trial court "to make orders for conservatorship of, possession of, access to, and support of the child."

During the pendency of the divorce, the trial court entered temporary orders that established the parties as joint managing conservators of M.S., named Amber as the parent with the exclusive right to designate M.S.'s primary residence within Victoria County, provided Chad with a standard possession order for M.S., established Chad's child support obligation as $1,056 per month based on his earning capacity,[2] and

---

[2] The trial court found that Chad was "voluntarily unemployed or underemployed and working less than full time or earning less than what he has earned historically or less than his qualifications would merit in order to support the child." *See* TEX. FAM. CODE ANN. § 154.066(a).

2

provided each party with the exclusive use of certain property. The matter proceeded to a bench trial on March 23, July 7, 8, and 9, in 2021, and March 30, 2022. At the July 7, 2021 setting, the parties appeared to continue the bench trial, but revealed that Amber was pregnant so the trial court could not enter a final order until after the child's birth. However, the trial court proceeded to hear evidence, delaying its final decree of divorce until after the child's birth.

On July 22, 2022, the trial court entered a final decree of divorce. The relevant child custody and support provisions of the final decree of divorce include (1) appointing Chad and Amber as M.S.'s joint managing conservators, with Amber possessing the exclusive right to designate her residence within a 150-mile radius of Victoria County; and (2) ordering Chad to pay child support in the amount of $1,200 per month. The trial court entered the following property division orders: (1) the parties would split fifteen Godard paintings equally; (2) Amber would receive 100% of Chad's 401(k), valued at approximately $8,000; (3) Chad must deliver to Amber $10,000 from "Federal Stimulus Payments"; (4) the parties would sell the marital residence and the proceeds would be divided equally between Chad and Amber; and (5) Amber would receive a hunting rifle as her separate property.

The trial court also entered temporary orders pending an appeal, ordering Chad to pay Amber attorney's fees in the amount of $15,000, deliverable to her attorney. The award of attorney's fees was not conditioned on an unsuccessful appeal and was to be delivered within one week from the trial court's order rather than at the conclusion of the appeal. The trial court issued findings of fact and conclusions of law. This appeal followed.

3

## II.    GEOGRAPHIC RESTRICTION

By his first issue, Chad argues that the trial court abused its discretion by permitting Amber to designate M.S.'s primary residence to anywhere within a 150-mile radius of Victoria County, instead of his request to restrict M.S.'s primary residence to Victoria and contiguous counties only.

### A.    Pertinent Facts

When the parties separated, they engaged in a week-on/week-off possession schedule.[3] However, Amber testified that M.S. was "starting to show issues," so, prior to the temporary orders, Amber modified the possession schedule to that of an expanded standard possession schedule. *See* TEX. FAM. CODE ANN. § 153.312 (standard possession schedule for parents who reside 100 mile or less apart); *id.* § 153.317 (providing for alternative beginning and ending times for a standard possession order, frequently referred to as an "expanded possession schedule"). Amber elaborated that M.S. "started having [bathroom] accidents again," but acknowledged that she "had ongoing issues with having bathroom accidents at school" since she was three. Amber opined that Chad is a "good father," and he and M.S. were close, but during their marriage Amber provided significantly more day-to-day care for M.S. Amber denied that M.S. was having any "issues" with the separation, but she then stated that M.S. has "more attitude, less manners, [and] more talking back" when she comes back from her visits with Chad. Amber otherwise did not have any major complaints about Chad's care of M.S.

Amber requested a 150-mile geographic restriction to provide her the opportunity

---

[3] M.S. was six years old at the time of trial and was approximately four when the parties separated.

to move "closer to better doctors" for her eldest daughter, who suffers from medical hardships. Moreover, Amber testified that she had family in Houston who act as a support system and the requested geographic restriction would allow her to move closer to them. Amber acknowledged that if she were permitted to move, she would be responsible for transporting M.S. halfway to Chad for exchanges. At the entry of the final decree of divorce, Amber had three children that all resided with her. Chad was the father to only M.S.

Chad testified that he believed his home was an overall "better environment" for M.S., expressing concerns that M.S. was being threatened by Amber and her new paramour for telling Chad about things going on in Amber's home. Chad also testified that he believed M.S. would benefit from counseling but acknowledged that he only made one call to get her enrolled when he found out the counselor could not see M.S. for six to seven months. According to Chad, M.S. cries and gets "real quiet and sad" when she is returning to Amber.

Chad testified that his extended family all lived nearby, and that M.S. sees them at least once a month. Conversely, Chad believed Amber's family is a bad influence, stating that "[t]hey drink[,] and they smoke[,] and they party[,] and they stay up later than . . . my type of traditional family." However, Chad acknowledged that he had only visited Amber's family seven times in nine years, usually for a holiday or some special occasion. Chad also believed he had a more stable home because he "always had a prominent job" and paid all the bills on time. Finally, Chad expressed concern that if M.S. were living in Amber's home, she would turn out like Amber.

Chad testified that he was working for Southern Select Crawfish, which required him to drive to and from Louisiana or Houston every Monday and Tuesday. Notwithstanding the travel, Chad believed he would be able to drop M.S. off at school and pick her up every day. Chad also testified that he only works a few hours on Thursdays to clean the restaurant, but the restaurant is closed on Thursdays and Sundays.

## B.      Applicable Law and Standard of Review

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id.* § 153.002. Moreover, it is the public policy of this state to "assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child." *Id.* § 153.001(a)(1). When rendering an order appointing joint managing conservators, the trial court shall designate which conservator has the exclusive right to designate the child's primary residence and establish "a geographic area within which the conservator shall maintain the child's primary residence." *Id.* § 153.134(b)(1)(A); *but see id.* § 153.134(b)(1)(B) (permitting a trial court to "specify that the conservator may determine the child's primary residence without regard to geographic location").

A trial court's order regarding conservatorship, including implementing a geographic restriction, is reviewed for an abuse of discretion. *In re Marriage of Cote*, 668 S.W.3d 891, 895 (Tex. App.—El Paso 2023, no pet.). "In family-law cases, the abuse-of-discretion standard overlaps with traditional sufficiency standards of review." *Id.* (citing *Roberts v. Roberts*, 531 S.W.3d 224, 231 (Tex. App.—San Antonio 2017, pet. denied)).

"A trial court abuses its discretion if it acts without reference to any guiding rules or principles." *Id.* "A trial court does not abuse its discretion if the record contains 'some evidence of probative and substantive character to support its decision.'" *Id.* (citing *In re Marriage of Christensen*, 570 S.W.3d 933, 937 (Tex. App.—Texarkana 2019, no pet.)). "Therefore, when reviewing the geographical restrictions, we consider whether (1) the trial court had sufficient evidence upon which to exercise its discretion; and (2) the trial court erred in its application of that discretion." *Id.*

"Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. We credit favorable evidence if a reasonable factfinder could do so and disregard contrary evidence unless a reasonable factfinder could not." *Wichita County v. Envt'l. Eng'g & Geotechnics, Inc.*, 576 S.W.3d 851, 861–62 (Tex. App.—Austin 2019, no pet.) (internal citations omitted). When we review a finding for factual sufficiency,

> we examine the entire record, considering the evidence in favor of and contrary to the challenged finding. We must not merely substitute our judgment for that of the trier of fact. If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and explain how the contrary evidence greatly outweighs the evidence in support of the challenged finding.

*Id.* at 862. Erroneous findings of fact do not require reversal unless the erroneous finding is on an ultimate fact issue, and immaterial findings are harmless. *Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 822 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

The Texas Supreme Court has identified an array of non-exclusive factors when assessing the best interest of a child in relation to the establishment or termination of a geographic restriction, including the (1) reasons for and against the move, (2) education,

7

health, and leisure opportunities afforded by the move, (3) accommodation of the child's special needs or talents, (4) effect of extended familial relationships, (5) effect on visitation with the child and communication with the noncustodial parent, (6) noncustodial parent's ability to relocate, and (7) the child's age. *Lenz v. Lenz*, 79 S.W.3d 10, 15–16 (Tex. 2002) (noting that American courts historically preferred more rigid geographic restrictions but were giving way to "a more fluid balancing test that permits the trial court to take into account a greater number of relevant factors").

## C.    Analysis

According to Chad, the "overly broad geographic restriction is not in M.S.'s best interest." Chad cites to various testimony to support his conclusion that the trial court should have implemented a geographic restriction to Victoria and contiguous counties. For example, Chad notes that M.S. had always lived in Victoria, that his family, with whom M.S. has a close relationship, all live in Victoria, and that Chad grew up in Victoria. Chad also pointed to evidence that he characterizes as poor decision-making by Amber, such as getting pregnant by another man prior to the conclusion of the divorce and removing M.S. from her school and enrolling her in a different school. Chad also challenges the trial court's following findings of fact as being "illogical" and "plac[ing] an undue burden on" him:

8.    The Court finds [Chad] has a flexible work schedule and that he routinely drives though [sic] Houston on his way to Louisiana for his work and leisure, and that he can see the child on those travels.

. . . .

10.    The Court finds a distance of 150 miles is reasonably calculated to balance the needs of [Amber] for family support with the travel for [Chad] to have meaningful contact with the child.

8

Trial courts have "'wide latitude' to determine what is in the best interest of the child." *See In re Marriage of Cote*, 668 S.W.3d at 896 (quoting *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). Our review of that latitude does not call on us to review evidence that could have supported a different ruling; rather, we consider whether "the record contains 'some evidence of probative and substantive character to support its decision.'" *See id.* at 895. In doing so, we conclude the record before us does contain some evidence to support the trial court's ruling. *See id.* Specifically, Amber testified that moving closer to her family would allow her to have more support for all three children and allow all three children to develop a closer relationship with Amber's extended family. *See Lenz*, 79 S.W.3d at 15–16. Moreover, the evidence showed that Chad can travel to and from exchanges, can electronically communicate with M.S., and could relocate with only a minimal impact on his possession schedule. *See id.*; *In re Marriage of Cote*, 668 S.W.3d at 896. Accordingly, we conclude the record contains "some evidence of probative and substantive character," such that it does not constitute an abuse of discretion. *See In re Marriage of Cote*, 668 S.W.3d at 895. Chad's first issue is overruled.

### III. CHILD SUPPORT

By his second issue, Chad argues that there was insufficient evidence to support the trial court's order of a $1,200 monthly child support obligation.

#### A. Pertinent Facts

Chad's earning statements from Southern Select Crawfish were admitted, showing a $1,200 per month salary.[4] Additionally, an LLC membership purchase agreement for

---

[4] Chad's net monthly income was $1,200, as his paychecks did not withhold any amounts for

Southern Select Crawfish was admitted, showing that Chad sold 99% of his membership interest in the company to his father for $10.00. A "doing business as" form was admitted, showing Chad doing business as CWS Services. Chad's federal tax returns for years 2017, 2018, and 2019 were admitted as exhibits. Chad agreed that for six or seven months in 2019, he earned $133,603, before being laid off.

Chad testified that he attended three years of college and had eighteen years' experience working in the oilfield, primarily selling drill bits, but also possessed management experience.[5] However, Chad explained that after he was laid off, oilfield drilling in the area and nationwide "dropped drastically," making it difficult for him to find employment. Chad denied being intentionally underemployed. Chad claimed that he had submitted "[p]robably 60" applications in the year leading up to trial but had not received an interview or call back.

Amber testified that Chad held several different jobs during their marriage, mostly in the oil and gas industry. However, although Chad applied for several jobs after being laid off, he told her that he refused to accept any job that did not pay what he believed he was worth.

## B.    Applicable Law and Standard of Review

A trial court may order one or both parents to provide financial support for the child through the child's eighteenth birthday or until high school graduation, whichever is later. TEX. FAM. CODE ANN. § 154.001(a)(1). Generally, child support is calculated by

_____

Medicare, Social Security, or federal income tax.

[5] Of the eighteen years' experience, Chad spent sixteen working for his own company, CWS, and approximately one year each for NOV, Inc. and Taurex.

10

determining the obligor parent's net monthly resources and multiplying such by the appropriate percentage provided by statute. *See id.* §§ 154.061–.133. Net resources include a variety of incomes, include all wage and salary, self-employment income, and income from retirement benefits, trusts, or other sources. *Id.* § 154.062. "To the extent possible, the court shall rely on evidence of a party's resources when applying the support guidelines." *Id.* § 154.0655. However, "[i]f the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment, the court may apply the support guidelines to the earning potential of the obligor." *Id.* § 154.066(a). Moreover, a trial court "may assign a reasonable amount of deemed income attributable to assets that do not currently produce income" or "income to income-producing assets that a party has voluntarily transferred or on which earnings have intentionally been reduced." *Id.* § 154.067(a), (b).

The trial court is not required to find that the obligor's motivation for being unemployed or underemployed is to avoid his or her child support obligation; rather, the trial court needs only to find that the obligor is intentionally unemployed or underemployed. *Iliff v. Iliff*, 339 S.W.3d 74, 80 (Tex. 2011). "Once the obligor has offered proof of his or her current wages, the obligee bears the burden of demonstrating that the obligor is intentionally unemployed or underemployed." *Id.* at 82. Trial courts should engage in a case-by-case determination as to whether child support should be based on earning potential rather than actual income and should do so cautiously. *Id.* (directing trial courts to consider the reasons obligor may earn less than his or her potential, such as spending more time with family, living closer to children, or to provide better health

11

benefits).

A trial court has discretion to set child support within the parameters provided by the Texas Family Code. *Id.* at 78. We will not disturb a trial court's order of child support "unless the complaining party can show a clear abuse of discretion." *Id.* A trial court abuses its discretion if it fails to analyze or apply the law correctly. *Id.* As before, the abuse-of-discretion standard here overlaps with traditional sufficiency of the evidence standards of review. *In re Marriage of Cote*, 668 S.W.3d at 895. The factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020). When a trial court issues findings of fact,

> they shall form the basis of the judgment upon all grounds of recovery and of defense embraced therein. The judgment may not be supported upon appeal by a presumed finding upon any ground of recovery or defense, no element of which has been included in the findings of fact; but when one or more elements thereof have been found by the trial court, omitted unrequested elements, when supported by evidence, will be supplied by presumption in support of the judgment. Refusal of the court to make a finding requested shall be reviewable on appeal.

TEX. R. CIV. P. 299.

## C.    Analysis

Chad argues that the trial court erred by ordering him to pay $1,200 per month in child support when there was no evidence to support a finding that he earned $80,000 per year. Accordingly, Chad contends that the amount set by the trial court "greatly exceeds the guidelines set forth in the family code." Amber, on the other hand, argues that the trial court implicitly found that Chad was intentionally underemployed and properly established his child support based on his earning potential rather than actual income.

12

*See* TEX. FAM. CODE ANN. § 154.066(a).

The trial court made the following findings of fact related to child support:

13. The Court finds $1,200.00 per month is the amount of child support that this Court ordered on December 9, 2020, after the evidence presented at a hearing on temporary orders on October 22, 2020, persuaded the Court that this amount of child support was commensurate with [Chad]'s income and ability to earn income.

14. The Court finds [Chad]'s employment status has not changed since the entry of the [t]emporary [o]rders.

15. Having considered the income of [Chad], his employment history, and his ability to earn income, the Court finds child support shall continue in the amount of $1,200.00 per month, that this amount is in the best interest of the child, and [Amber] has the exclusive right to receive child support.

According to Chad, "the trial court failed to make a finding that [he] was intentionally underemployed" and Chad's earning statement and canceled checks from Southern Select Crawfish "constitute clear and convincing evidence of [his] income." We disagree with both points.

Although the trial court did not expressly state that it found that Chad was intentionally underemployed, its stated findings support the conclusion that it did so.[6] For example, it set Chad's child support "commensurate with [his] income and *ability to earn income*." *See* TEX. FAM. CODE ANN. § 154.066(a); TEX. R. CIV. P. 299. Because § 154.066(a) allows the trial court to apply the support guidelines to the earning potential of the obligor only when it finds intentional unemployment or underemployment, we presume that the trial court made such a finding. *See* TEX. R. CIV. P. 299. Moreover, this

---

[6] Chad did not request additional or amended findings of fact and conclusions of law. TEX. R. CIV. P. 298.

13

finding is supported by the evidence. *See id.* For example, Amber testified that Chad told her that he would not take a job for less than what he believed he was worth, Chad's income history included income of approximately $133,000 for six to eight months of work in 2019, and Chad received pay of less than minimum wage from a business he sold to his father for only $10.[7] *See In re Commitment of Stoddard*, 619 S.W.3d at 674; *see also* TEX. FAM. CODE ANN. § 154.067(a), (b).

Although Chad testified that he had applied to over sixty jobs and was not offered a single interview, the trial court could have disbelieved Chad's testimony and believed Amber's testimony that Chad refused to accept a job that paid less than he believed he was worth. *See In re Commitment of Stoddard*, 619 S.W.3d at 674. Additionally, Chad testified that he earned money on occasion by selling personal property for other people and attempted to make money by day trading, showing that he had the ability and means to engage in other work. Accordingly, we conclude there was sufficient evidence to support the trial court's presumed finding that Chad was intentionally underemployed. *See* TEX. FAM. CODE ANN. § 154.066(a); *Iliff*, 339 S.W.3d at 80–82. Chad's second issue is overruled.

## IV.    PREMARITAL AGREEMENT

By his third issue, Chad argues that the trial court erred by disregarding the parties' premarital agreement. Amber contends, on the other hand, that the premarital agreement only contemplated disposition of property in the event of separation or death, not

---

[7] The gross income for federal minimum wage is $1,256.67, while the net income would be $1,142.79. *See* OFFICE OF THE ATTORNEY GENERAL, 2022 TAX CHARTS (2022), https://csapps.oag.texas.gov/system/files/2021-12/2022_Tax_Chart.pdf (last visited October 25, 2023).

14

dissolution of marriage, and was therefore inapplicable to the parties' divorce. Alternatively, Amber argues "that the agreement is unambiguously contradictory," which requires us to "disregard what [we] cannot harmonize."

## A.  Pertinent Facts

The premarital agreement was admitted as an exhibit at trial. Attached to the premarital agreement was schedule A1, which listed ten items as Chad's separate property along with each item's associated debt. The schedule noted that there was no separate property listed for Amber. The premarital agreement contained the following pertinent language:

1.  The separate property owned by each party at the execution of this [a]greement, however and whenever acquired, will be owned and managed solely by such party at all times and will remain the separate property of such party after the execution of this [a]greement, with no claim by the other party upon separation or otherwise.

2.  The parties hereby acknowledge that with respect to any determination of ownership of property that may occur in the event of the parties separating, or upon the death of a party, all property will be treated as separate property owned solely by one party unless there is proof of shared legal ownership.

3.  Unless a particular piece of property is explicitly documented as being owned by both parties, the following types of property will not be deemed as shared property: [The premarital agreement then lists various categories of property.[8]]

---

[8] The categories of property are:

(a) any property owned by a party at the date of execution of this [a]greement; (b) any property owned by a party after the date of execution of this [a]greement; (c) any property acquired in exchange for present property, or from the proceeds of a sale of present property, whether direct or indirect, of a disposition of present property; (d) any income or proceeds derived from property owned by a party before or after the execution of this [a]greement; (e) any property acquired by either party with income received during their marriage from property owned by a party before or after the execution of this [a]greement; (f) any increase in value during the period of marriage of any property owned by a party

Chad's original petition alleged that the parties "entered into a premarital agreement altering their marital property rights [to] certain property on and during their marriage." Chad asked the trial court "to enforce the agreement and divide the marital estate in accordance with its terms." Amber's answer and counterpetition similarly alleged that the parties "entered into a premarital agreement prior to the date of marriage."

At trial, Amber agreed that the parties entered into the premarital agreement prior to their engagement. Amber denied being under duress when she signed the agreement. Notwithstanding the premarital agreement, Amber believed anything acquired during the marriage was community property.

B.    **Applicable Law and Standard of Review**

"'Premarital agreement' means an agreement between prospective spouses made in contemplation of marriage and to be effective on marriage." TEX. FAM. CODE ANN. § 4.001(1). Parties to a premarital agreement may set out "the rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located." *Id.* § 4.003(a)(1). They may also establish how property will be disposed of in the event of "separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event." *Id.* § 4.003(a)(3). To be effective, "[a] premarital agreement must be in writing and signed by both parties." *Id.* § 4.002. No consideration

---

before or after the execution of this [a]greement; (g) any property acquired by a party by gift from the other party; (h) any property acquired by a party by gift from a third party; (i) any property acquired by a party through an inheritance; (j) any winnings from any sport, game[,] or lottery; (k) any award or settlement acquired from a lawsuit; (l) any proceeds from an insurance policy; (m) any earnings, salary[,] or wage[] acquired before or after the execution of this [a]greement; and (n) any savings acquired before or after the execution of this [a]greement.

is necessary for a premarital agreement to be enforceable. *Id.*

"Texas law generally favors premarital agreements." *In re Marriage of Sauls & Worley*, 648 S.W.3d 359, 364 (Tex. App.—Texarkana 2021, no pet.) (quoting *Larson v. Prigoff*, No. 05-99-01755-CV, 2001 WL 13352, at *1 (Tex. App.—Dallas Jan. 8, 2001, no pet.) (mem. op.)); *see Beck v. Beck*, 814 S.W.2d 745, 749 (Tex. 1991) ("[P]ublic policy [dictates] that premarital agreements should be enforced."). "Generally, in Texas, courts interpret premarital agreements like other written contracts." *In re Marriage of I.C. & Q.C.*, 551 S.W.3d 119, 122 (Tex. 2018) (cleaned up). When a contract is unambiguous, we interpret it as a matter of law. *Id.* "When interpreting a contract, our 'primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument. Objective manifestations of intent control,' not the subjective intent of the parties." *Id.* (quoting *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763–64 (Tex. 2018)). "We strive to give effect to all of the words and provisions so that none is rendered meaningless." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015). "Unless the contract indicates that the parties used a term in a technical or unusual sense, contractual terms are given their plain, ordinary, and generally accepted meaning." *In re Marriage of I.C. & Q.C.*, 551 S.W.3d at 122 (first citing *Dynegy Midstream Servs. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009); and then citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). However, unlike contracts, premarital agreements should be construed narrowly in favor of the community estate. *Williams v. Williams*, 246 S.W.3d 207, 211 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

**C.    Analysis**

We first address Amber's contention that the agreement only contemplates disposing of property in the event of separation or death and not in the event of divorce. *See* Tex. Fam. Code Ann. § 4.003(a)(3). The trial court made a similar conclusion: "The Court finds a 'Prenuptial Agreement,' signed by the parties on July 17, 2012, before their marriage, did not provide for the disposition of the marital property upon marital dissolution as allowed by Texas Family Code, [§] 4.003(3) [sic]." Because the construction of a premarital agreement is a matter of law, we review the trial court's conclusion de novo. *In re Marriage of I.C. & Q.C.*, 551 S.W.3d at 122.

When interpreting the premarital agreement, "our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument. Objective manifestations of intent control, not the subjective intent of the parties." *Id.* (cleaned up) Here, the parties did not expressly state that the premarital agreement would dictate the disposition of property in the event of divorce, instead utilizing the phrase "separation." Merriam-Webster defines separation as a "cessation of cohabitation between a married couple by mutual agreement or judicial decree." Separation, Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/separation?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited October 18, 2023). Similarly, Black's Legal Dictionary defines it as "[a]n arrangement whereby a husband and wife live apart from each other while remaining married, either by mutual consent (often in a written agreement) or by judicial decree; the act of carrying out such an arrangement." Separation, Black's Law Dictionary (11th ed. 2019). However, we note

18

that Texas law does not provide a trial court with authority to enter a judicial decree relating to separation as opposed to divorce. *See generally* TEX. FAM. CODE ANN. §§ 1.001–9.302 (Title 1 of the Texas Family Code: The Marriage Relationship). Moreover, a trial court in Texas may only divide the community estate in a decree of divorce or annulment. *See id.* § 7.001.

Accepting Amber's construction of the premarital agreement, requires that we conclude that upon the parties' separation—mutual agreement to live apart—their property would be characterized as one or the other's separate property, but upon divorce, the property would be recharacterized as community property subject to division. Such an interpretation is an untenable one. *See Wenske v. Ealy*, 521 S.W.3d 791, 794 (Tex. 2017) (rejecting "mechanical rules of construction, such as giving priority to certain clauses over others, or requiring the use of so-called 'magic words'" (quoting *Concord Oil Co. v. Pennzoil Expl. & Prod. Co.*, 966 S.W.2d 451, 465 (Tex. 1998))). However, even if we were to conclude that the parties' use of "separation" instead of "divorce" meant separation, the parties both testified that they separated near the end of May or beginning of June in 2020. Thus, the premarital agreement would apply regardless.

Amber's alternative argument is grounded in a position that two paragraphs within the premarital agreement are so contradictory that one must be disregarded in its entirety. Amber compares paragraph two's requirement of "proof of shared ownership" with paragraph three's requirement that shared ownership be "explicitly documented." Amber posits that paragraph three's requirement of explicit documentation not found in paragraph two creates an irreconcilable conflict. We disagree that the two paragraphs are

19

irreconcilable. While paragraph two does not dictate what proof of shared legal ownership is necessary, it nonetheless requires some proof. Paragraph three then goes on to require proof by explicit documentation to establish shared ownership of specific types of property. Moreover, even if we were to find the two paragraphs to be in conflict and strike paragraph three as Amber requests, she would still be required to produce some type of proof of shared legal ownership of any property that she claimed is community property, explicitly documented or otherwise.

On the other hand, Chad challenges additional conclusions by the trial court:

18. The Court finds the "Prenuptial Agreement" did not abrogate the parties' rights to acquire community property as provided in Texas law.

19. The Court finds the "Prenuptial Agreement" never mentioned or referred to community property.

20. The Court finds [Chad] prepared the "Prenuptial Agreement" himself via Legal Zoom.

21. The Court finds the "Prenuptial Agreement" did not provide that certain property acquired by the parties during the marriage would be separate property, but only that it would not be shared property.

We note that where Chad obtained the premarital agreement bears no weight as to its effect. Additionally, while the trial court may have correctly concluded that the premarital agreement did not abrogate their parties' rights to acquire community property through the agreement, the parties agreed that absent evidence otherwise, all property would be characterized as one's separate property. Thus, while the parties *could* acquire or convert property to community property, the premarital agreement required that there be documentation to support such a characterization as community property.

Chad next argues that although the premarital agreement did not use the phrase

"community property," the agreement nonetheless addresses it through its use of "shared property." We agree. The premarital agreement refers to two types of property: separate and shared. Although Texas law does not refer to "shared property," it provides for only two classifications of property: separate and community. *See* TEX. FAM. CODE ANN. § 3.001 (separate); *id.* § 3.002 (community). No magic words are required when construing a contract, *see Wenske*, 521 S.W.3d at 794; rather, we ascertain and give effect to the parties' intent. *See In re Marriage of I.C. & Q.C.*, 551 S.W.3d at 122. Here, it is clear that the parties' reference to "shared property" as a contrast to separate property intended to refer to community property. *See id.* Moreover, the trial court's conclusion that the premarital agreement "did not provide that certain property acquired by the parties during the marriage would be separate property, but only that it would not be shared property" is incorrect. *See id.* The premarital agreement expressly provides that "*all property* will be treated as separate property owned solely by one party unless there is proof of shared legal ownership."[9] (Emphasis added). Any other interpretation would render the provision meaningless. *See RSUI Indem. Co.*, 466 S.W.3d at 118.

Accordingly, we conclude that the premarital agreement did provide that certain property would be separate property and trial court erred by finding it inapplicable to the divorce. Chad's third issue is sustained.[10]

---

[9] Alternatively, "shared property" could refer to each party having their own separate interest in property, such as a 50% separate property interest by each spouse. Nonetheless, the agreement necessarily requires proof to overcome a separate property presumption, rather than proof to overcome a community property presumption, and that all property otherwise be separate property owned solely by one spouse.

[10] As part of Chad's third issue, he asks this Court to conclude that the trial court erred by characterizing certain property as community property and dividing it. Because Chad's fourth issue also deals with the trial court's characterization of property and its subsequent division, we consider his request

By his fourth issue, Chad argues that the trial court erred by characterizing certain property as community rather than separate and that the trial court's division of the remaining community property should be reversed. Amber, on the other hand, argues that the trial court correctly identified the property as community and its division was not an abuse of discretion.

## A.      Pertinent Facts

Amber testified that she believed the marital home on Weston Woods was community property because it was purchased after the parties were married although she was not sure how Chad paid for it because he "kept [her] out of all the financial [decisions]." Amber acknowledged that the premarital agreement expressly listed two houses, amongst other items, as Chad's separate property: a house on Sparrow Lane and one on Spring Ridge. Amber agreed that she did not pay any amounts towards either property because she did not work during that period of their relationship.

Amber also testified that Chad gave her a .30-06 hunting rifle as a gift but explained that Chad would not let her take it when she moved out. Amber requested that the trial court divide fifteen paintings between them; however, Amber acknowledged that Chad owned some of the paintings prior to the marriage and could not recall how many they purchased during the marriage. Amber also asked the trial court to order Chad to turn over $10,000 in federal stimulus payments. Amber subsequently acknowledged that she did not know how much Chad actually received and that one payment was already divided

---

there.

between them.

Chad testified that he believed the Weston Woods house to be his separate property pursuant to the premarital agreement. The trial court admitted several documents, which Chad alleged traced the funds used to purchase the Weston Woods house from the proceeds from the sale of his separate property including the Sparrow Lane house and the Spring Ridge house. The documents included the closing disclosure, promissory note, and general warranty deed for the Spring Ridge house from its sale.[11] Additional exhibits include the title insurance policy for the Weston Woods house, listing only Chad as the insured, the general warranty deed for the Weston Woods house, listing only Chad as the owner, and the closing disclosure with a copy of a cashier's check, which shows the property was paid in full.

Chad denied gifting the .30-06 hunting rifle to Amber. As to the Godard paintings, Chad testified that he purchased eleven of the fifteen prior to the marriage and four during the marriage. Chad acknowledged that no Godard paintings were listed in the premarital agreement as his separate property; notwithstanding the premarital agreement, Chad agreed that four of the paintings could be divided as community property. Similarly, Chad agreed that his 401(k), which had approximately $8,000, could be divided as community property. Chad disagreed that he received $10,000 in federal stimulus payments; instead, Chad testified that he received about $4,200 in total. The first payment, which Chad

---

[11] The closing disclosure shows that a portion of the proceeds of the sale paid off the remaining mortgage for 121 Spring Ridge, leaving $314,541.57 due to Chad as the seller. Amber was listed as a grantor on the general warranty deed; however, Chad argues this was required by Texas Family Code § 5.001. *See* TEX. FAM. CODE ANN. § 5.001 ("Whether the homestead is the separate property of either spouse or community property, neither spouse may sell, convey, or encumber the homestead without the joinder of the other spouse except as provided in this chapter or by other rules of law.").

believed was for $1,800, was already split with Amber. The remaining $2,400 was issued as a check payable to Amber and Chad. Although Amber and Chad both endorsed the check, Chad was unable to cash it without Amber being present. Despite listing $10,000 in federal stimulus payments on her inventory to the trial court, Amber acknowledged that the amount was just a guess, and she did not know how much Chad received.

**B.      Applicable Law and Standard of Review**

Generally, a spouse's separate property consists of "(1) the property owned or claimed by the spouse before marriage; (2) the property acquired by the spouse during marriage by gift, devise, or descent; and (3) the recovery for personal injuries sustained by the spouse during marriage, except any recovery for loss of earning capacity during marriage." TEX. FAM. CODE ANN. § 3.001. Community property, on the other hand, "consists of the property, other than separate property, acquired by either spouse during marriage." *Id.* § 3.002. However, as noted above, spouses may enter a contract "with respect to: . . the rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located"; or "the disposition of property on separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event." *Id.* § 4.003(a)(1), (a)(3).

"Property possessed by either spouse during or on dissolution of marriage is presumed to be community property." *Id.* § 3.003(a). To prove otherwise requires clear and convincing evidence. *Id.* § 3.003(b). This generally requires more than mere testimony if it is "contradicted or unsupported by documentary evidence tracing the asserted separate nature of the property." *Graves v. Tomlinson*, 329 S.W.3d 128, 139

24

(Tex. App.—Houston [14th Dist.] 2010, pet. denied). However, the parties may eliminate the community property presumption through a premarital agreement. *See In re Marriage of Nash*, 644 S.W.3d 683, 694–95 (Tex. App.—Texarkana 2022, no pet.) (recognizing that parties may contract to eliminate the community property presumption but finding the parties failed to do so where the property was not included in the types of property excluded from being community property); *In re Works*, 118 S.W.3d 906, 909 (Tex. App.—Texarkana 2003, orig. proceeding) (noting that while "[n]ot all premarital agreements remove the couple's entire marital estate from Texas' community property laws[,] [m]any, if not most, assuredly do").

The trial court must divide the community property in a just and right manner. TEX. FAM. CODE ANN. § 7.001; *In re Marriage of Nash*, 644 S.W.3d at 692. However, the trial court has no authority to award or divide one spouse's separate property to the other. *In re Marriage of Nash*, 644 S.W.3d at 692. "Reversible error exists as a matter of law only if the trial court characterizes property as community property and awards it to one spouse when it is established as the separate property of the other spouse." *Id.* at 693 (quoting *In re Marriage of Moncey*, 404 S.W.3d 701, 706 (Tex. App.—Texarkana 2013, no pet.)). However, whether property is community or separate is often a mixed question of law and fact. *Id.* "When faced with conflicting evidence, the fact[]finder may choose which witnesses to believe and may resolve inconsistencies in any witness' testimony." *Id.* (quoting *Bouknight v. Bouknight*, No. 06-14-00034-CV, 2014 WL 4930818, at *2 (Tex. App.—Texarkana Oct. 2, 2014, pet. Denied) (mem. op.)).

The trial court does not necessarily need to divide the community property equally.

*Richardson v. Richardson*, 424 S.W.3d 691, 696 (Tex. App.—El Paso 2014, no pet.). The trial court has wide discretion in dividing the community property and may consider the follow factors:

> (1) the spouses' capacities and abilities; (2) benefits which the party not at fault would have derived from the continuation of the marriage; (3) business opportunities; (4) relative physical conditions; (5) relative financial conditions; (6) disparity of ages; (7) size of separate estates; (8) the nature of the property; and (9) disparity of earning capacity.

*Id.* (citing *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981)). "The legal and factual sufficiency of the evidence are not independent grounds of error, but rather they are factors in our assessment of whether the trial court abused its discretion." *Id.*

**C.      Analysis**

Chad complains that the trial court mischaracterized the marital home at 625 Weston Woods, seven of eleven Godard paintings, and a .30-06 hunting rifle as community property, thus dividing it as part of the community property. Moreover, Chad argues the trial court improperly awarded all of his 401(k) to Amber, which he agreed was community property, and erred by awarding Amber "[f]ederal [s]timulus [p]ayments totaling $10,000.00." Amber disputes Chad's characterization as to the Weston Woods house and the hunting rifle, agrees to Chad's characterization of the Godard paintings and part of the federal stimulus payments, and disagrees that awarding her the entire 401(k) was improper.

The premarital agreement provides that "all property will be treated as separate property owned solely by one party unless there is proof of shared legal ownership." Moreover, the agreement precludes certain property from being deemed as "shared property" absent explicit documentation, thus eliminating the community property

presumption. *See In re Marriage of Nash*, 644 S.W.3d at 694–95.

Because the parties agree as to the characterization of the Godard paintings, we modify the judgment's provision directing the parties to split four Godard paintings. For the federal stimulus payments, Chad asks this Court to render a judgment that he does not owe Amber any portion of the federal stimulus payments while Amber asks that he be ordered to turn over $1,200, which represents half of the $2,400 sent to Chad in both of their names. At trial, Chad testified that the payment was issued to both he and Amber, which required both of their signatures to cash or deposit. Thus, there is no evidence that this federal stimulus payment was his sole separate property; rather, the evidence demonstrates that each party had an equal right in the federal stimulus payments as their own separate property when considered under the premarital agreement. Accordingly, we agree with Amber that the final decree of divorce should be modified to provide that Chad provide Amber $1,200 from the federal stimulus payments.

As to the hunting rifle, Amber testified that Chad gifted her the hunting rifle while Chad denied doing so. The trial court's findings of fact concluded that Chad did gift Amber the hunting rifle, thus making it her separate property. *See* TEX. FAM. CODE ANN. § 3.001(2). Because the trial court is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, we cannot say that Chad proved that the hunting rifle was his separate property as he argues.[12] *See In re Commitment of Stoddard*, 619

---

[12] Chad argues that he proved that the hunting rifle was his separate property by clear and convincing evidence, which is the degree of proof necessary to overcome the community property presumption. *See* TEX. FAM. CODE ANN. § 3.003(b). However, where no community property presumption exists, the degree of proof necessary to establish property as one's separate property must be by a preponderance of the evidence. Otherwise, if a party was required to prove such by clear and convincing evidence, the other party would have an advantage. If both parties are required to provide clear and

S.W.3d at 674. Accordingly, we conclude the trial court did not err by finding that the .30-06 hunting rifle was Amber's separate property.

Furthermore, the trial court erred by concluding that the Weston Woods house was community property subject to division. As noted, the premarital agreement required that all property be one spouse's separate property unless there was proof of shared ownership. Here, the deed for Weston Woods contains only Chad's name. Chad testified that the funds used to purchase Weston Woods came from the proceeds of the sale of the two prior homes: Sparrow Lane and Spring Ridge, each deemed his separate property by the terms of the premarital agreement. *See id.* The premarital agreement further contemplates that "any property acquired in exchange for present property, or from the proceeds of a sale of present property, whether direct or indirect, of a disposition of present property" would remain the separate property of one spouse. Amber did not present any evidence that she had any ownership in Weston Woods, instead relying solely on the community property presumption to conclude that it was community property. Nor did Amber allege that her separate property was used to enhance Chad's separate property, which would have entitled her to a claim for reimbursement. *See* TEX. FAM. CODE ANN. § 3.402.

Lastly, the parties disagree on the appropriate resolution of the distribution of Chad's 401(k), but they both agree it is community property subject to division. Because we find that the trial court committed reversible error as to the characterization of some of the property at issue, we must remand the remaining community property for a new

---

convincing evidence and neither does so, then the courts would be left without the ability to issue a ruling.

28

division. *See Graves*, 329 S.W.3d at 153. However, we express no opinion as to whether the current division constitutes a just and right division.

In summation, we sustain Chad's issue as it relates to the Weston Woods house, overrule it as to the .30-06 hunting rifle, sustain it as it relates to the amount of federal stimulus payments owed to Amber but decline to conclude that Chad is not required to turn over any funds, and sustain both parties' requests as to the Godard paintings.

## VI.    APPELLATE ATTORNEY'S FEES

By his final issue, Chad argues the trial court abused its discretion by ordering Chad to pay Amber's appellate attorney's fees without making the award conditional on an unsuccessful appeal by Chad and ordering the fees payable before the conclusion of appellate proceedings.

## A.    Applicable Law and Standard of Review

"The family code permits the trial court to render a temporary order necessary for the preservation of the property and for the protection of the parties during an appeal, including an order for the payment of attorney's fees and expenses." *Halleman v. Halleman*, 379 S.W.3d 443, 454 (Tex. App.—Fort Worth 2012, no pet.). The trial court's temporary order for appellate attorney's fees is reviewed for an abuse of discretion. *See id.* at 455. "As long as there is a credible showing of the need for attorney's fees in the amount requested and the ability of the opposing spouse to meet that need, the trial court has authority by temporary orders to require the payment of such fees." *Id.* at 454 (quoting *Herschberg v. Herschberg*, 994 S.W.2d 273, 279 (Tex. App.—Corpus Christi–Edinburg 1999, no pet.)); *see In re Fuentes*, 506 S.W.3d 586, 594 (Tex. App.—Houston [1st Dist.]

29

2016, orig. proceeding) ("There is no evidence in the record that [Wife] will incur $50,000.00 in monthly attorney's fees on appeal or that such an amount is reasonable and necessary."); *see also Benoit v. Benoit*, No. 01–15–00023–CV, 2015 WL 9311401, at *15 (Tex. App.—Houston [1st Dist.] Dec. 22, 2015, no pet.) (mem. op.) ("We hold that, without supporting evidence showing the reasonableness of the fees, the trial court abused its discretion by awarding appellate attorney's fees of $5,000.")

## B.    Analysis

Chad's argument that the trial court erred by awarding Amber appellate attorney's fees is multifarious. Chad argues the trial court erred because the fees were not conditioned on an unsuccessful appeal by Chad, the fees were payable prior to the conclusion of the appeal, and Amber did not present any evidence regarding the preservation of property or the protection of the child. *See* TEX. FAM. CODE ANN. § 6.709(a)(2); *id.* § 109.001(a). Finally, Chad argues that the trial court's denial of Amber's request for attorney's fees during trial and her subsequent failure to appeal precludes her from seeking and receiving appellate attorney's fees through temporary orders.

Chad primarily relies on a series of cases that hold that appellate attorney's fees cannot be unconditional as it would penalize a party for taking a successful appeal. *See In re Ford Motor Co.*, 988 S.W.2d 714, 721 (Tex. 1998) (orig. proceeding); *McGibney v. Rauhauser*, 549 S.W.3d 816, 827 (Tex. App.—Fort Worth 2018, pet. denied) ("[W]e begin with the general rule that because a party should not be penalized for successfully appealing an error occurring in a lower court, appellate attorney's fees must be conditioned upon a successful appeal."); *Sipco Servs. Marine, Inc. v. Wyatt Field Serv.*

*Co.*, 857 S.W.2d 602, 607 (Tex. App.—Houston [1st Dist.] 1993, no writ). However, these cases do not consider the statute at hand, which expressly permits the trial court to "requir[e] the payment of reasonable and necessary attorney's fees and expenses" during an appeal and are thus inapposite. *See* TEX. FAM. CODE ANN. § 6.709(a)(2). Our sister courts have considered a similar provision permitting temporary orders during an appeal from an order affecting the parent-child relationship. *See In re Mansour*, 630 S.W.3d 103, 107–08 (Tex. App.—San Antonio 2020, orig. proceeding); *see also In re Jafarzadeh*, 05-14-01576-CV, 2015 WL 72693, at *2 (Tex. App.—Dallas Jan. 2, 2015, orig. proceeding) (mem. op.) ("In suits affecting the parent-child relationship in which attorney's fees are awarded pending appeal, deferring the fee award until resolution of the appeal is impractical because it defeats the purpose of the fee award, which is to provide the resources necessary to allow the appeal to be prosecuted by the appellee.").

Although § 109.001(a)(5)'s basis for requiring payment of appellate attorney's fees—the best interest of the child—is different than § 6.709's—protection of property—the rationale behind requiring the fees be payable immediately and not conditioned on the outcome remains the same. *See In re Mansour*, 630 S.W.3d at 107–08. Accordingly, we overrule Chad's first and second subissues.

Chad next argues that Amber did not present any evidence regarding the necessity of the temporary order for the preservation of property and protection of the parties as contemplated by the statute. *See* TEX. FAM. CODE ANN. § 6.709(a). Amber, in contrast, posits that the trial court was able to conclude that the order was necessary to preserve property and protect the parties based on the evidence adduced at trial. Neither party

cites to any authority that supports their proposition. However, permitting the trial court to consider the evidence presented to it during trial promotes judicial economy, reduces costs to the parties, and eliminates needless testimony. Thus, we agree with Amber. Moreover, § 6.709(a)'s requirement for notice and hearing provides the parties with an opportunity to present additional testimony or rebut a party's request for temporary orders. *See id.* Thus, we overrule Chad's no-evidence subissue.

Lastly, Chad argues that Amber was precluded from seeking appellate attorney's fees because she requested them in her counterpetition and the trial court ordered that the parties were responsible for their own attorney's fees in its final decree of divorce. Chad posits that Amber was required to appeal the trial court's order on that ground, which she has failed to do. *See* TEX. R. APP. P. 25.1(C). Thus, Chad's interpretation and application of § 6.709 is that the trial court cannot order appellate attorney's fees unless it has already granted appellate attorney's fees. Such an interpretation would render § 6.709(a)(2) meaningless. Accordingly, we reject Chad's interpretation and overrule his fourth subissue. Having rejected each of Chad's arguments, we overrule his fifth issue.

## VII. CONCLUSION

We affirm the trial court's judgment in part, affirm as modified in part, reverse and render in part, and reverse and remand in part.

CLARISSA SILVA
Justice

Delivered and filed on the
16th day of November, 2023.